## CAROL A. WILCOX *vs.* JOHN G. TRAUTZ.

Plymouth. March 5, 1998. - April 21, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Contract,* Validity, Cohabitation agreement. *Cohabitation,* Nonmarital. *Domestic Partner.*

Discussion of cases concerning the validity of agreements between unmarried persons living together. [329-332]

This court concluded that unmarried cohabitants may, subject to the rules of contract law, lawfully contract concerning property, financial, and other matters relevant to their relationship, and that such an agreement is valid even if expressly made in contemplation of a common living arrangement, except to the extent that sexual services constitute the only, or dominant, consideration for the agreement, or to the extent that enforcement should be denied on some other public policy ground [332]; further, such an agreement is not governed by the threshold requirements that apply to an antenuptial agreement [334].

A contract between two adult unmarried cohabitants was valid and enforceable, where the evidence demonstrated that the principal purpose of the agreement was to clarify the parties' rights with respect to the division of assets acquired during their relationship in the event that they should separate, and not to secure sexual fidelity or sexual services [333-334], and where the agreement was otherwise in compliance with the rules of contract law [334-335].

CIVIL ACTION commenced in the Plymouth Division of the Probate and Family Court Department on August 21, 1992.

The case was heard by *Edward W. Farrell,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Alan J. Perry* for the defendant.

*Kevin P. Phillips* for the plaintiff.

GREANEY, J. After approximately twenty-five years of living together as an unmarried couple, the plaintiff and the defendant separated. The plaintiff brought an action in the Probate and Family Court which sought (a) a declaration under G. L. c. 231A that a written agreement between the parties was invalid and

unenforceable, (b) an injunction preventing the defendant from transferring or encumbering the house in which the parties resided at the time of their separation, and (c) the imposition of a constructive trust for her benefit in a one-half interest in that home or an award of damages on theories of implied promise or quantum meruit.

A judge of the Probate and Family Court conducted a bifurcated trial. The judge first considered the evidence pertaining to the enforceability of the parties' written agreement and concluded that it was invalid and should not be enforced. The judge then considered the evidence pertaining to the trust and damages claims, and he concluded that the plaintiff was not entitled to recover either under a constructive trust theory or under an implied contract theory, but that, to prevent unjust enrichment, she was entitled to damages of approximately $30,000 on her quantum meruit claim.

The defendant appealed from the final judgment, and we transferred the case to this court on our own motion. We conclude that the parties' agreement is valid and enforceable and, as a result, the plaintiff's damages award must be set aside. Accordingly, we vacate the judgment and order the entry of a new judgment that declares the agreement to be valid and enforceable and disposes of the damages claim in the defendant's favor.

1. We summarize the judge's findings on the challenged agreement. In 1967, the plaintiff, then age twenty-two years, and the defendant, then age twenty-five years, began living together in an apartment rented by the defendant in Abington. The defendant, who earned approximately $100 more per week than the plaintiff, was employed at a local supermarket as a meat cutter, and the plaintiff was employed by the same company as a meat wrapper. The plaintiff had completed the tenth grade in high school and subsequently received a high school equivalency diploma. The defendant had completed the eleventh grade.

The parties moved from the Abington apartment to a house purchased by the defendant in Rockland in 1973, and in 1980, after the defendant sold the Rockland property, they moved to a house he purchased in Halifax, where they resided together until the time of trial. The titles to both the Rockland and the Halifax properties were in the defendant's name only.

Between 1973 and 1992, the plaintiff contributed $25 a week

toward general household expenses. Throughout the course of the relationship, the plaintiff performed household duties, including all the food and clothes shopping, which she paid for solely from her earnings, as well as all of the cooking, cleaning, and laundry. She also entertained the parties' friends and family in the parties' home.

The plaintiff contributed some of her income toward the maintenance and improvement of the parties' home. She paid for the purchase and installation of ceramic flooring, wall-to-wall carpeting, patio furniture, and a deck. She and the defendant also shared the cost of a television, an oven, a refrigerator, and an air conditioner.

By contributing some of her salary to the parties' home, the plaintiff did not secure her own investments, and, at the time of trial, she did not have any savings and only a small pension. The plaintiff's contributions enabled the defendant to use some of his funds to purchase and maintain his real estate and an airplane.

In March, 1989, the plaintiff became involved in another relationship which spurred the defendant to seek legal advice regarding the parties' rights with respect to the assets acquired during their relationship. Pursuant to the defendant's request, his attorney drafted an agreement concerning the parties' respective rights.[1] The defendant testified that he discussed the terms of the agreement with the plaintiff before instructing his attorney to draft the agreement.

The defendant presented the agreement to the plaintiff and told her that if she did not sign it, their relationship would be over and she would be required to move out of the Halifax house. He advised her to seek legal advice before signing the agreement, and, although she had the opportunity to do so, she

---

[1]The agreement basically establishes that, whether acquired before or during the relationship, "what's mine is mine and what's yours is yours." Specifically, the agreement provides that each party's earnings and property is his or hers alone, and the other party shall have no interest in the property of the other; any services rendered by either party are voluntary and without expectation of compensation; the parties shall maintain separate accounts; any debts or obligations are the responsibility of the party who acquired them; if one party contributes to the mortgage payment of a premises owned by the other party, the contribution is to be deemed rent only and shall not create in the contributor any interest in the property; and any money transferred from one party to the other, with the exception of mortgage or rent payments, shall be deemed a loan.

did not seek any advice regarding the agreement. A few days later, the parties signed the agreement before a notary public.

The judge stated that "[t]he defendant's testimony indicates that the primary purpose of the agreement was to secure sexual fidelity to him from the plaintiff." The judge did not credit the plaintiff's testimony that she had not read the agreement, and he rejected the plaintiff's claim that she was forced or coerced into signing the agreement.

At the time of the execution of the agreement, the defendant owned the Halifax property, valued at $180,000; an amphibious airplane, valued at $55,000; various bank accounts, totalling approximately $1,300; individual retirement accounts; and a one-half share of real estate in Maine, valued at $15,000. The plaintiff did not have any assets in her name, other than a bank account containing a small amount, and a one-half share in the Maine real estate. She owned household furniture, clothing, and jewelry. The parties were aware of the principal assets, and fully understood each other's financial status prior to the execution of the agreement.

The agreement provided that the plaintiff vacate the Halifax residence within thirty days after being requested to do so by the defendant. When the plaintiff became involved in another relationship in 1992, the defendant gave her thirty days' notice to leave the home. When the defendant asked the plaintiff to leave at the expiration of the thirty days, the plaintiff refused to do so, and instead moved into another bedroom where she resided until the time of trial.

2. We have not previously passed on the validity of written agreements between two unmarried cohabitants that attempt to define the rights of the parties as to services rendered and property acquired during their relationship. Our early decisions precluded the enforcement of an agreement between unmarried parties if the agreement was made in consideration that the parties should cohabit. See, e.g., *Zytka* v. *Dmochowski*, 302 Mass. 63, 63-64 (1938) (if money is given by one party to the other "entirely or partially in consideration that the parties should cohabit, then the parties have no standing to invoke the aid of a court of equity to compel the repayment of the money and they have no rights which are cognizable in equity"). See also *Otis* v. *Freeman*, 199 Mass. 160 (1908). More recently, we have held valid oral promises between unmarried cohabitants so long as "illicit sexual relations were [not] an inherent aspect of the

agreement or a 'serious and not merely an incidental part of the performance of the agreement.' " *Margolies* v. *Hopkins*, 401 Mass. 88, 92 (1987), quoting *Green* v. *Richmond*, 369 Mass. 47, 51 (1975).

Social mores regarding cohabitation between unmarried parties have changed dramatically in recent years and living arrangements that were once criticized are now relatively common and accepted. "As an alternative to marriage, more couples are choosing to cohabit. These relationships may be of extended duration, sometimes lasting as long as many marriages. In many respects, these cohabitation relationships may be quite similar to conventional marriages; they may involve commingling of funds, joint purchases of property, and even the birth of children." (Footnotes omitted.) Perry, Dissolution Planning in Family Law: A Critique of Current Analyses and a Look Toward the Future, 24 Fam. L.Q. 77, 78 (1990) (hereinafter Perry). With the prevalence of nonmarital relationships today, a considerable number of persons live together without benefit of the rules of law that govern property, financial, and other matters in a marital relationship. Thus, we do well to recognize the benefits to be gained by encouraging unmarried cohabitants to enter into written agreements respecting these matters, as the consequences for each partner may be considerable on termination of the relationship or, in particular, in the event of the death of one of the partners.[2] "In recent years, increased attention has focused on the advisability of unmarried couples entering into cohabitation contracts in which they . . . detail the financial consequences of dissolution." Perry, *supra*. This may be especially important in a jurisdiction like Massachusetts where we do not recognize common law marriage, do not extend to unmarried couples the rights possessed by married couples who divorce, and reject equitable remedies that might have the effect of dividing property between unmarried parties.

Courts in other jurisdictions have concluded, as we did in *Margolies* v. *Hopkins, supra,* that an express agreement between adult unmarried persons living together is unenforceable only to the extent that it explicitly and inseparably is founded on sexual

[2] Studies suggest that most people enter nonmarital relationships in ignorance of the legal consequences or under the assumption that at least some legal protections are available. See Perry, Dissolution Planning in Family Law: A Critique of Current Analyses and a Look Toward the Future, 24 Fam. L.Q. 77, 77 n.1 (1990).

relations. *Kozlowski* v. *Kozlowski*, 80 N.J. 378, 385 (1979), citing *Marvin* v. *Marvin*, 18 Cal. 3d 660 (1976). See *Cook* v. *Cook*, 142 Ariz. 573 (1984); *Boland* v. *Catalano*, 202 Conn. 333 (1987); *Kinkenon* v. *Hue*, 207 Neb. 698 (1981); *Hay* v. *Hay*, 100 Nev. 196 (1984); *Dominiquez* v. *Cruz*, 95 N.M. 1 (Ct. App. 1980); *Morone* v. *Morone*, 50 N.Y.2d 481 (1980); *Mullen* v. *Suchko*, 279 Pa. Super. 499 (1980); *Latham* v. *Latham*, 274 Or. 421 (1976), *S.C.*, 281 Or. 303 (1978); *Small* v. *Harper*, 638 S.W.2d 24 (Tex. Ct. App. 1982); *Kinnison* v. *Kinnison*, 627 P.2d 594 (Wyo. 1981). Cf. *Poe* v. *Estate of Levy*, 411 So. 2d 253 (Fla. Dist. Ct. App. 1982) (express, implied, and equitable remedies); *Glasgo* v. *Glasgo*, 410 N.E.2d 1325 (Ind. Ct. App. 1980) (contractual and equitable remedies); *Collins* v. *Davis*, 68 N.C. App. 588, *S.C.*, 312 N.C. 324 (1984) (contractual and equitable remedies); *Watts* v. *Watts*, 137 Wis. 2d 506 (1987), *S.C.*, 152 Wis. 2d 370 (1989) (express, implied, and equitable remedies). Furthermore, such agreements are not invalid merely because the parties may have contemplated the creation or continuation of a nonmarital relationship when they entered into the agreement. *Marvin* v. *Marvin*, *supra* at 670. As the New York Court of Appeals stated in *Morone* v. *Morone*, *supra* at 486, "[t]he theory of these cases is that while cohabitation without marriage does not give rise to the property and financial rights which normally attend the marital relation, neither does cohabitation disable the parties from making an agreement within the normal rules of contract law." Although none of these cases specifically concerns a written agreement between unmarried cohabitants attempting to resolve issues such as the parties' rights as to property, earnings, and services rendered, the principles they announce also apply to such an agreement.[3] Implicit in these principles is tacit acknowledgment that unmarried cohabitants may agree to hold real property jointly or in common, agree to create joint bank and other accounts, do the same for investments, and, of course, make testamentary dispositions. These financial and property arrangements stem from a relationship that involves sexual cohabitation, but, in creating them, the parties are principally motivated by an intention to hold, or dispose of, property in a mutually acceptable way in order to manage day-to-day matters and to avoid litiga-

---

[3]We do not adopt those portions of *Marvin* v. *Marvin*, 18 Cal. 3d 660 (1976), or the other cases cited, which grant property rights to a nonmarital partner in the absence of an express contract.

tion when the relationship ends. Such financial planning is enforceable according to the usual rules of contract. It makes no sense to uphold these arrangements between unmarried cohabitants, but to withhold enforcement of written agreements between the same parties when they attempt to settle the financial and other consequences if they should separate.

To the extent we have not previously done so, we adopt the view that unmarried cohabitants may lawfully contract concerning property, financial, and other matters relevant to their relationship.[4] Such a contract is subject to the rules of contract law and is valid even if expressly made in contemplation of a common living arrangement, except to the extent that sexual services constitute the only, or dominant, consideration for the agreement, or that enforcement should be denied on some other public policy ground.[5] We shall no longer follow cases in this Commonwealth to the contrary.

Nothing we say here today is intended to derogate from the clear distinction we have made in our cases between the legal rights of married and unmarried cohabitants, see, e.g., *Collins* v. *Guggenheim*, 417 Mass. 615, 617-618 (1994) (cohabitants not entitled to equitable distribution of property); *Reep* v. *Commissioner of the Dep't of Employment & Training*, 412 Mass. 845, 851 (1992) (married person who leaves work to join spouse is presumed to have satisfied statutory requirement for unemployment compensation eligibility; long-term nonmarital partner could offer proof toward meeting standard, but is not entitled to presumption); *Feliciano* v. *Rosemar Silver Co.*, 401 Mass. 141 (1987) (nonmarital partners have no right to sue for loss of consortium); *Davis* v. *Misiano*, 373 Mass. 261, 263 (1977) (nonmarital partners have no right to separate support and alimony). Nor should anything we have said be taken as a suggestion or intimation that we are retreating from our prior expressions regarding the importance of the institution of marriage and the strong public interest in ensuring that its integrity is not threatened. See *Capazzoli* v. *Holzwasser*, 397 Mass. 158, 160 (1986), and cases cited. We have never recognized common

[4]However, if the parties eventually were to marry, the agreement is no longer valid, and the rules concerning antenuptial, postnuptial, or separation agreements will then govern any agreement thereafter entered into by them.

[5]For example, there is a public interest in ensuring that one of the parties to the agreement does not become a public charge. See *O'Brien* v. *O'Brien*, 416 Mass. 477, 479 (1993). Cf. *Osborne* v. *Osborne*, 384 Mass. 591, 599 (1981).

law marriage in this Commonwealth, see *Heistand* v. *Heistand,* 384 Mass. 20, 24 (1981), nor have we "permitted the incidents of the marital relationship to attach to an arrangement of cohabitation without marriage." *Collins* v. *Guggenheim, supra.* We do not do so now.

The defendant argues that the judge erred in concluding that the contract violated public policy because its sole purpose was to secure the sexual fidelity of the plaintiff. We agree with the defendant's argument. While the defendant testified that an act of infidelity on the part of the plaintiff, coupled with her claim that he could not just "throw her out," led him to seek legal advice, no evidence showed that the only or dominant purpose of the agreement was to secure the plaintiff's sexual fidelity, or that "sexual relations were an inherent aspect of the agreement or a 'serious and not merely an incidental part of the performance of the agreement.' " *Margolies* v. *Hopkins, supra* at 92, quoting *Green* v. *Richmond,* 369 Mass. 47, 51 (1975). Indeed, the agreement provides that sexual services are not a consideration for the making of the agreement. The agreement also states an intent "to protect and define each other's rights pertaining to past and future services rendered, earnings, accumulated property and furnishings and other matters that may be contained herein."

The principal purpose of the agreement was to clarify the parties' rights with respect to the division of assets acquired during their relationship in the event that they should separate. The parties' rights were established as of the date of the execution of the agreement in 1989.[6] That the defendant in 1992 exercised his right under the agreement to request that the plaintiff leave the Halifax house, did not alter the terms of the agreement, nor did the defendant's request establish that the plaintiff's fidelity was the sole foundation upon which the agreement rested.

"Virtually all agreements between nonmarital partners can be

---

[6]The agreement contains a clause, entitled "Duration of This Agreement," which states:

"This agreement shall remain in effect until either party leaves or removes himself or herself from the common domicile [*sic*] with the intention not to return, or until they marry, or until they make a new written agreement which is contrary to the terms of this agreement."

said to be 'involved' in some sense in the fact of their mutual sexual relationship, or to 'contemplate' the existence of that relationship." *Marvin* v. *Marvin*, 18 Cal. 3d 660, 672 (1976). By the same token, all such agreements could be said to rest on the sexual fidelity of the parties, as, presumably, one party's infidelity might cause the termination of the parties' relationship. We recognize that the plaintiff's alleged infidelity in 1992 precipitated both the defendant's request that she leave and the performance of the agreement. Nonetheless, these circumstances alone do not establish that enforcement of the agreement is against public policy and therefore unenforceable. "By looking . . . only to the consideration underlying the agreement, we provide the parties and the courts with a practical guide to determine when an agreement between nonmarital partners should be enforced." *Id.*

The defendant also contends that the judge erred in applying to the parties' agreement requirements attendant to antenuptial agreements, in particular that the agreement be fair and reasonable. As stated above, marriage gives each party substantial rights concerning the assets of the other which unmarried cohabitants do not have. An agreement between two unmarried parties is not governed by the threshold requirements that apply to an antenuptial agreement. See generally *Osborne* v. *Osborne*, 384 Mass. 591 (1981); *Rosenberg* v. *Lipnick*, 377 Mass. 666 (1979). Accordingly, the agreement between the plaintiff and the defendant is enforceable so long as it conforms with the ordinary rules of contract law, and a court is no more entitled to inquire into its fairness and reasonableness than it is in respect to contracts generally. Contrast *R.R.* v. *M.H.*, 426 Mass. 501, 512 (1998) (surrogacy agreement).

We conclude that the plaintiff and the defendant were free to contract with respect to property, financial, and other matters relevant to their relationship,[7] and that the specific agreement at issue is valid and enforceable. It is undisputed that the parties,

[7]The parties have no children, and thus the agreement did not raise any issues regarding the legal restrictions on their ability to affect the rights of their children by the agreement. As to agreements that do concern children, we would not, in any event, enforce those that do not conform to the children's best interests. Cf. *R.R.* v. *M.H.*, 426 Mass. 501, 512 (1998) (mother and father may not make binding best-interests-of-the-child determination by private agreement); *Osborne* v. *Osborne*, *supra* at 599 (court empowered to modify antenuptial agreement where provision affecting right of custody of minor child is not in best interest of child); *Knox* v. *Remick*, 371 Mass. 433, 437

both adults, had the capacity to contract and understood each other's financial worth prior to the execution of the agreement. Moreover, the plaintiff was advised to seek counsel regarding the agreement and chose not to do so. There was no claim of fraud, overreaching, or unconscionability. The plaintiff is employed and makes no assertion that, as a result of the agreement, she will be unable to support herself. The judge found that the plaintiff was not forced or coerced to sign the agreement.

Finally, we note that the plaintiff voluntarily entered into a relationship with the defendant, and continued to live with him for many years despite her knowledge that he was unlikely to marry her. The agreement she signed essentially tracked the living arrangement she had shared with the defendant for twenty-five years, in which they maintained separate legal and financial identities, and did not merge their financial affairs. There is no evidence that during the course of their relationship, the plaintiff was the "weaker" of the two cohabitants, or that she had been dissatisfied with the way they managed their affairs.[8]

3. We need not address the defendant's other arguments. We note only that the Probate Court appears to have had jurisdiction over the plaintiff's quantum meruit claim. See *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. 789, 793 (1986); *Glick* v. *Greenleaf*, 383 Mass. 290, 294-295 (1981); *Bradford* v. *Richards*, 11 Mass. App. Ct. 595, 598 (1981).

4. The judgment is vacated, and a new judgment is to be entered declaring the agreement to be valid and enforceable and disposing of the damages claim in the defendant's favor.

*So ordered.*

(1976) ("Parents may not bargain away the rights of their children to support from either one of them"). See Perry, *supra* at 77 n.2.

[8]We recognize that unmarried parties who enter into these agreements may not necessarily share equal bargaining power, and disparities in bargaining power are more likely to arise when an agreement is negotiated long after the parties began cohabiting. Although one could argue that such disparities existed between the parties here, and were based, at least in part, on the traditional gender roles assumed by the parties, this alone does not invalidate the agreement. In any event, such disparities do not always exist, and the gender of the parties does not necessarily dictate which party is in a more financially secure position. For a comprehensive discussion of the issues related to bargaining power in negotiating cohabitation agreements, see Perry, *supra* at 88-93.