Roberta F. SALZMAN, Petitioner,

v.

Erwin BACHRACH, Respondent,

and

Countrywide Home Loans, Inc., a New York corporation, and Terry Schall, the Public Trustee of Eagle County, Colorado, Defendants.

No. 99SC166.

Supreme Court of Colorado,
En Banc.

March 20, 2000.

Rehearing Denied April 10, 2000.

Dunn, Abplanalp & Mauriello, P.C., Arthur A. Abplanalp, Jr., Vail, Colorado, Attorneys for Petitioner.

Law Office of Steven M. Segall, Steven M. Segall, Andrew D. Haas, Lakewood, Colorado, Attorneys for Respondent.

Justice KOURLIS delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' decision in *Bachrach v. Salzman*, 981 P.2d 219 (Colo.App.1999).[1] We conclude that the Respondent, Erwin Bachrach, established a claim of unjust enrichment and is entitled to restitution of at least some of his contributions to the residence titled in the name of Petitioner Roberta F. Salzman. Accordingly, we affirm the court of appeals and remand this case to the trial court for a determination of the amount of restitution based upon the principles set out in this opinion.

## I.

Bachrach and Salzman met in 1986 when Salzman, a divorcee, responded to a personal advertisement in the *Vail Trail* newspaper placed by Bachrach, a widower. Bachrach and Salzman enjoyed a relationship that included dining, travel, and visiting with family and friends. The two maintained separate residences during the first several years of their relationship. Bachrach lived in a one-bedroom condominium that he owned, and Salzman resided in a townhouse. Salzman disliked her townhouse because of its small size, poor winter access, and because she had difficulty climbing the stairs.

In 1993, Bachrach and Salzman agreed to build a home together. Bachrach placed the condominium that he owned on the market late that year, and sold it in February 1994. Bachrach netted roughly $100,000 from the sale. On March 31, 1994, Bachrach and Salzman purchased a lot in Eagle, Colorado for $49,000, and titled it in both of their names. They contributed approximately equally to the price.

Bachrach, a designer and drafter of residential properties for fifty years, designed the new home. Initially, he estimated a total construction cost of $370,000. The construction crew broke ground on July 19, 1994 and substantially completed construction by April 1995, when the two moved into the home together. The home ultimately cost $520,-876.50 to build. Bachrach contributed $167,-528.86 and Salzman paid $353,347.64 of the total cost. In March 1995, the residence appraised for $445,000; in November 1996, it appraised for $584,000.

---

1. We granted certiorari on the sole issue: "Whether a donor may recover funds contributed to a donee, in law or in equity, where the trial court found, based upon evidence at trial, that the transfer was in consideration, partially or entirely, for a cohabitation agreement."

On April 18, 1995, Bachrach quitclaimed his interest in the property to Salzman, and Salzman closed on the sale of her townhouse. Bachrach's delivery of the deed to Salzman at that time served two functions. It facilitated Salzman's ability to obtain a favorable mortgage on the home, and offered tax advantages to Salzman. However, there was a third purpose that came to light approximately six months later.

In November 1995, Salzman's ex-husband notified her that he intended to terminate his monthly maintenance payment of $1800 because of her alleged marriage to Bachrach, cohabitation, and joint homeownership. Bachrach replied to Salzman's ex-husband in writing that they were not married, but lived together for convenience and companionship; that they maintained separate financial accounts; that she alone owned the home; and that his contribution was in exchange for an indefinite period of free rent. After receiving the letter, Salzman's ex-spouse did not further pursue termination of maintenance. Hence, in a written document, Bachrach disavowed any interest in the home—equitable or otherwise.

During their cohabitation in the new home, Salzman made all of the mortgage payments and Bachrach paid only for some utilities and food. He did not pay rent. Initially, the parties shared a bedroom, but after about a year, they found one another intolerable and Bachrach moved into a separate bedroom. In August 1996, Salzman asked Bachrach to move out, and he refused. On January 15, 1997, Salzman changed the locks and posted a No Trespassing sign on the property, with the added phrase "This means you Erwin." Bachrach has not lived in the home since that day.

On January 17, 1997, Bachrach filed suit in the District Court in the County of Eagle, Colorado against Salzman, seeking a partition of the property under the theory that the two were joint venturers in the construction of the home. Salzman asserted counterclaims that Bachrach negligently designed the home, poorly managed its construction, misrepresented himself as an architect, and miscalculated the cost of the home, among others. The parties tried the case before the District Court in November 1997. The court denied both parties the relief that they sought.

The court of appeals reversed the order of the trial court holding that Salzman would be unjustly enriched were she allowed to keep Bachrach's contributions to the home. The court of appeals opined, however, that on remand, in determining the amount owed Bachrach, the trial court could consider the reasonable rental value Bachrach received while he resided in the house.

## II.

We begin our analysis by addressing Bachrach's argument that Salzman should reimburse him for his design work, construction management services, and his $170,000 contribution on principles of unjust enrichment. The Restatement of Restitution states "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement of Restitution § 1 (1937). "A person obtains restitution when he is restored to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its monetary equivalent." *Id.* § 1 cmt.a.

 Unjust enrichment is a form of quasi-contract or a contract implied in law. *See Dove Valley Bus. Park Assocs., Ltd. v. Board of County Comm'rs of Arapahoe County,* 945 P.2d 395, 403 (Colo.1997). As such, it is an equitable remedy and does not depend on any contract, oral or written. *See Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Ass'n,* 649 P.2d 1093, 1097 (Colo.1982). The theory does not require any promise or privity between the parties. *See Wistrand v. Leach Realty Co.,* 147 Colo. 573, 576, 364 P.2d 396, 397 (1961). Rather, it is a judicially created remedy designed to avoid benefit to one to the unfair detriment of another. *See Cablevision,* 649 P.2d at 1097.

 In Colorado, a plaintiff seeking recovery for unjust enrichment must prove: (1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the

benefit without paying. *See DCB Constr. Co. v. Central City Dev. Co.*, 965 P.2d 115, 119–20 (Colo.1998).[2]

◼ Applying the first element to the facts present here, we find that Bachrach's payment of nearly $170,000 and efforts in designing the home and managing the project certainly came at his expense. It is hardly arguable that Bachrach did not suffer in some way after paying for nearly one-third of the final construction cost of a home from which he has been evicted.[3]

◼ Considering the second prong, we conclude that Salzman benefited from Bachrach's expenditure on the construction of the home in which she now resides. Salzman owns and lives in an expensive custom home that Bachrach helped design and purchase.[4]

The final prong then asks the dispositive question: whether it would be unjust for the defendant to retain the benefit conferred. Absent some countervailing consideration, the answer to this question is that it would be unjust to allow Salzman to keep Bachrach's entire contribution to the home.[5]

### III.

### A.

Salzman argues that Bachrach is without a remedy because he delivered the funds to her in exchange for a cohabitation agreement. She contends that public policy disapproves of such an arrangement and any decision in favor of Bachrach would operate to defeat that policy, citing three cases. *See Houlton v. Prosser*, 118 Colo. 304, 194 P.2d 911 (1948); *Baker v. Sockwell*, 80 Colo. 309, 251 P. 543 (1926); *Baker v. Couch*, 74 Colo. 380, 221 P. 1089 (1923).

In *Baker v. Couch*, this court declined to order the return of thirty-five promissory notes to the plaintiff, Paul Couch. Couch, a twenty-three year old man, and Alma Baker, a woman in her early thirties, lived together, in an intimate relationship. *See* 74 Colo. at 381–83, 221 P. at 1089–90. Couch had been married and divorced previously, and Baker had been married three times. *See id.* at 382, 221 P. at 1089. Couch argued that Baker obtained the notes through undue influence, and Baker contended they were a gift. The parties did execute a contract, which Couch argued was without consideration. *See id.* at 381, 221 P. at 1090. The contract closed with the following language: "Party to the first part [Baker] agrees to permit the party of the second part [Couch] to call at her home at reasonable hours and to continue the friendship already begun, until such time as the parties hereto agree to terminate this agreement." *Id.* at 383, 221 P. at 1089. The court concluded that past, present, and future sexual relations were the sole consideration for the original delivery of the promissory notes and the "so-called written contract." *Id.*, 221 P. at 1090. Thus, the court held, because the contract was immoral, "neither law nor equity will aid either to enforce, revoke or rescind."[6] *Id.*

---

**2.** We reformulated the elements of unjust enrichment two years ago to remove the test language that the defendant must appreciate and accept the benefit conferred. *See DCB Constr. Co.*, 965 P.2d at 119–20. The court of appeals in this case applied an earlier version of the unjust enrichment test. We reach an identical conclusion using the new formula.

**3.** Bachrach may have contributed more than one-third of the purchase price if the value of his labor is considered.

**4.** Salzman argued at the trial court and the court of appeals that Bachrach provided sub-par services and that she disliked several features in the home. These allegations do not convince us that she has not benefited from Bachrach's contribution of money and services.

The parties dispute the actual value of Bachrach's contribution given that the appraised value of the home just prior to completion was considerably less than its cost. We leave that determination to the trial court on remand.

**5.** We note that the trial court explicitly found that the contribution was not a gift from Bachrach to Salzman and we are bound by that determination.

**6.** In a related case, *Baker v. Sockwell*, Alma Baker attempted to force the holder of some of the same promissory notes described in *Couch* to deliver them to her. *See* 80 Colo. at 310–11, 251 P. at 544–45. The court held that it would not aid in Baker's attempt to collect the notes because of the means by which she obtained title to them. *See id.* at 314–15, 251 P. at 544–45.

In *Houlton*, a single man and a married woman cohabited as husband and wife during a five-year period in the 1940s. *See Houlton*, 118 Colo. at 305, 194 P.2d at 911. Houlton purchased a home and the two took title as joint tenants. *See id.* When the relationship soured, Houlton sought to have the court order his female cohabitant, Prosser, to convey to him any interest she held in the home. *See id.* The court noted that Houlton knew that Prosser was married during most of their relationship and that he admitted that they lived together in an intimate relationship. *See id.* at 306, 194 P.2d at 911. The court reasoned that even though Houlton maintained that the sexual relationship was not in consideration of the deed, he was "not in a position to invoke the aid of a court of equity in his effort to obtain a conveyance of [Prosser's] interest in the property to himself." *Id.*, 194 P.2d at 912.

■ Bachrach distinguishes the above cases because he contributed to the construction project in the expectation that he would live there indefinitely. Although Bachrach highly valued Salzman's companionship, he asserts that sexual relations constituted no part of the exchange. We find Bachrach's argument persuasive.

The facts present here are distinguishable from the *Baker v. Couch* line of cases. The facts in *Couch* and *Sockwell* exhibited clearer evidence than present here that the sole consideration for the monetary conveyance was sexual relations. Perhaps due to the era of the decisions, the court provided very little information to suggest that Baker offered Couch anything other than an intimate relationship. In essence, the contract mirrored a contract for prostitution. Contrarily, in this case, Salzman's agreement to allow Bachrach to live in the home constituted substantial consideration for his contribution.[7]

Although a closer case, *Houlton* can also be distinguished because one of the cohabitants was married during the majority of the parties' relationship. This adulterous component made Houlton considerably more culpable than Bachrach.

**B.**

■ Even were we unable to distinguish the above line of cases, we would decline to follow them under the facts present here. Although we find the rule of law in these earlier cases persuasive to some degree, social norms and behaviors have changed to such an extent that we now join the majority of courts in other states in holding that nonmarried cohabiting couples may legally contract with each other so long as sexual relations are merely incidental to the agreement. Furthermore, such couples may ask a court for assistance, in law or in equity, to enforce such agreements.

The frequency of nonmarital cohabitation has substantially increased since the 1940s. *See* Bureau of the Census, *Marital Status and Living Arrangements: March 1993*, VII–VIII, tbl.D (May 1994) (indicating that from 1970 to 1993 alone, the number of unmarried-couple households in the U.S. increased 571%, from 523,000 to 3,510,000). As a result, courts throughout the country now face with increasing regularity the controversies arising out of the breakup of these relationships. Litigants have asked courts to establish the appropriate balance between the public policy favoring marriage, old cases explicitly disapproving any intimate contact outside of marriage, and accepted modern mores. The majority of courts have held in favor of the ability of nonmarried couples to contract with one another and to enforce those contracts in court.

In many jurisdictions, courts have examined the factual circumstances underlying unmarried cohabiting relationships, and have regularly enforced express and implied contracts between nonmarried cohabitants and provided equitable remedies. *See Cook v. Cook*, 142 Ariz. 573, 691 P.2d 664 (1984) (determining that valid agreements supported by proper consideration between unmarried cohabitants will be enforced by the courts according to the intent of the parties); *Marvin v. Marvin*, 18 Cal.3d 660, 134 Cal.

---

7. For clarification purposes, we discuss the merits of this issue in terms of the "consideration" exchanged. However, we agree with the court of appeals that Bachrach and Salzman did not enter into either an express contract or an implied-in-fact contract.

Rptr. 815, 557 P.2d 106 (1976) (holding, in this landmark case, that California courts must enforce express and implied agreements unless based wholly on sexual relations, and allowing the application of equitable remedies); *Boland v. Catalano,* 202 Conn. 333, 521 A.2d 142 (1987) (concluding that the existence of a sexual relationship between nonmarried cohabitants did not preclude enforcement of an express agreement to share equally in the assets accumulated while living together as long as the agreement was not founded upon their sexual relationship); *Mason v. Rostad,* 476 A.2d 662 (D.C.1984) (finding that a man could recover the reasonable value of the work contributed toward the renovation of another's house reduced by the benefits he received from the arrangement despite the fact they were unmarried and living together); *Spafford v. Coats,* 118 Ill.App.3d 566, 74 Ill.Dec. 211, 455 N.E.2d 241 (1983) (finding that a female unmarried cohabitant who furnished most of the money for several vehicles purchased during a cohabitating relationship was not barred by their cohabitation from bringing an unjust enrichment claim against the other cohabitant who retained control over the vehicles); *Wilcox v. Trautz,* 427 Mass. 326, 693 N.E.2d 141 (1998) (holding that unmarried cohabitants may lawfully contract concerning property, financial, and other relevant matters); *Hudson v. DeLonjay,* 732 S.W.2d 922 (Mo.Ct.App.1987) (opining that a man and woman living together without marriage may contract with each other); *Western States Constr., Inc. v. Michoff,* 108 Nev. 931, 840 P.2d 1220 (1992) (allowing unmarried cohabitating adults to agree to hold property that they acquire as though it were community property); *Collins v. Davis,* 68 N.C.App. 588, 315 S.E.2d 759 (1984) (reasoning that a married man living with a single woman was not barred from bringing a suit in equity for unjust enrichment when he contributed to the purchase of a house titled in the woman's name, if the agreement was not based exclusively on sexual intercourse); *Tarry v. Stewart,* 98 Ohio App.3d 533, 649 N.E.2d 1 (1994) (finding that the parties did not enter into a cohabitation agreement, and that under the facts, one party would not be unjustly enriched if allowed to keep the property in

which they lived during their cohabitation); *Wilbur v. DeLapp,* 119 Or.App. 348, 850 P.2d 1151 (1993) (holding that the unmarried parties who lived together intended that the female cohabitant have a one-half interest in property held in the male partner's name); *Lawlis v. Thompson,* 137 Wis.2d 490, 405 N.W.2d 317 (1987) (holding that nonmarital cohabitation alone would not preclude a cohabitant from bringing an unjust enrichment claim against the other cohabitant). *But see Long v. Marino,* 212 Ga.App. 113, 441 S.E.2d 475 (1994) (suggesting that the law will not support a contract founded on the immoral consideration of unmarried cohabitation); *Hewitt v. Hewitt,* 77 Ill.2d 49, 31 Ill.Dec. 827, 394 N.E.2d 1204 (1979) (refusing to grant to a cohabitant one-half of the assets acquired during the cohabitation, reasoning that enforcing the contracts would grant a legal status to cohabitation); *Schwegmann v. Schwegmann,* 441 So.2d 316 (La.Ct.App. 1983) (concluding that unmarried cohabitation does not give rise to property rights analogous to those arising from marriage, and that claims in equity are barred when sexual relations are interwoven with other tendered benefits); *In re Estate of Alexander,* 445 So.2d 836 (Miss.1984) (deciding that the legislature was better suited to handle unmarried cohabitation policies and expressing concern that extending equitable principles would resurrect the abolished common-law marriage doctrine).

Legal scholars endorse the trend allowing nonmarried cohabitants to contract with one another. *See* Harry G. Prince, *Public Policy Limitations on Cohabitation Agreements: Unruly Horse or Circus Pony?,* 70 Minn. L.Rev. 163 (1985); J. Thomas Oldham & David S. Caudill, *A Reconnaissance of Public Policy Restrictions Upon Enforcement of Contracts Between Cohabitants,* 18 Fam. L.Q. 93 (1984); Robert C. Casad, *Unmarried Couples and Unjust Enrichment: From Status to Contract and Back Again?,* 77 Mich. L.Rev. 47 (1978); Herma Hill Kay & Carol Amyx, *Marvin v. Marvin: Preserving the Options,* 65 Calif. L.Rev. 937 (1977).

■ We find these authorities persuasive and agree that cohabitation and sexual relations alone do not suspend contract and equi-

ty principles. We do caution, however, that mere cohabitation does not trigger any marital rights.[8] A court should not decline to provide relief to parties in dispute merely because their dispute arose in relationship to cohabitation. Rather, the court should determine—as with any other parties—whether general contract laws and equitable rules apply.

In this case, the evidence supports Bachrach's claim that sexual relations with Salzman were not the sole motivation for his contributions toward the construction of the home. He sold his condominium and placed all of the proceeds and other funds directly into the home in which he expected to live for the balance of his life. Both Salzman and Bachrach took title to the land on which the home was built, and according to undisputed testimony, Bachrach quitclaimed his entire interest in the home largely for the benefit of Salzman.

In consideration for Bachrach's contributions he obtained a much larger, more luxurious home in which to live and work, a cohabitant for whom he cared, and reduced living expenses. As we see it, sexual relations with Salzman constituted only a portion of the benefits received by Bachrach, and definitely were not the sole consideration. While the home purchase related to their intimate relationship because they both lived in the home, Bachrach's cause of action does not depend on their sexual relations. Thus, their cohabitation does not bar this suit in equity.

## IV.

Salzman also argues that Bachrach comes to the court with unclean hands because he agreed in writing that he had no ownership interest in the house and overtly structured the ownership of the home and other aspects of their relationship to avoid the negative effect a common-law marriage might have had on her receipt of maintenance payments. In her view, this wrongdoing should prevent Bachrach from his pursuit of an equitable remedy.

Generally, "[o]ne who comes into equity must come with clean hands." Dan B. Dobbs, *Law of Remedies* § 2.4(2) (2d ed.1993). The principal derives from the concept that one who seeks equity must do equity. *See id.* Many different forms of improper conduct may bar a plaintiff's equitable claim, and the conduct need not be illegal. *See id.* Generally, courts apply this doctrine only when a plaintiff's improper conduct relates in some significant way to the claim he now asserts. *See id.* Otherwise, only those leading pristine and blameless lives would ever be entitled to equitable relief. *See id.*

In Colorado, the clean hands maxim dictates that one who has engaged in improper conduct regarding the subject matter of the cause of action may, as a result, lose entitlement to an equitable remedy. *See Rhine v. Terry,* 111 Colo. 506, 508, 143 P.2d 684, 684 (1943). The clean hands doctrine is one of public policy, devised to protect the integrity of the court. *See id.* at 508, 143 P.2d at 685.

Upon remand, the trial court should address whether the doctrine of unclean hands should limit Bachrach's claim for relief. Specifically, we note that Bachrach stated in writing that he held no interest in the house for the express purpose of deceiving Salzman's ex-husband and a court in Florida. On the other hand, the trial court may conclude that Bachrach did so at Salzman's urging and that, ultimately, she benefited far more from the deception than did Bachrach.

## V.

Having determined that Bachrach's claim is not barred by the parties' cohabitation, we must now remand the case to the court of appeals to be returned to the trial court for further factual determinations. Several financial issues remain to be sorted out by the trial court. For example, the trial court must determine the exact worth of Ba-

---

**8.** Common-law marriage is more than mere cohabitation. "A common law marriage is established by the mutual consent or agreement of the parties to be husband and wife, followed by a mutual and open assumption of a marital relationship." *People v. Lucero,* 747 P.2d 660, 663 (Colo.1987).

chrach's contribution to date, and the reasonable rental value for the periods Bachrach lived in the house. As set forth above, we also direct the trial court to determine whether the unclean hands doctrine should bar any portion of Bachrach's recovery.