FILED
United States Court of Appeals
Tenth Circuit

August 26, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

---

JACK J. GRYNBERG; GRYNBERG
PRODUCTION CORPORATION, and
its successors; GRYNBERG
PETROLEUM COMPANY, and its
successors,

        Plaintiffs - Appellants,

v.

TOTAL S.A.,

        Defendant - Appellee.

No. 06-1328

_____

JACK J. GRYNBERG; GRYNBERG
PRODUCTION CORPORATION and
its successors; GRYNBERG
PETROLEUM COMPANY, and its
successors,

        Plaintiffs - Appellants,

v.

SHELL EXPLORATION B.V. and
SHELL INTERNATIONAL
EXPLORATION AND PRODUCTION
B.V. f/k/a SHELL INTERNATIONAL
PETROLEUM MAATSCHAPPIJ
B.V.,

        Defendants - Appellees.

No. 06-1355

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NOS. 03-CV-1280-WYD-BNB and 03-CV-01212-LTB-PAC)**

Michael S. Porter, Wheat Ridge, Colorado, (Roger A. Jatko, Grynberg Petroleum Company, Greenwood Village, Colorado, with him on the briefs) for Plaintiffs - Appellants Jack J. Grynberg; Grynberg Production Corporation, and its successors; Grynberg Petroleum Company, and its successors.

John P. Bowman (William J. Boyce, Jennifer Lee Price, and Christopher R. Hart, with him on the briefs) of Fulbright & Jaworski L.L.P., Houston, Texas, for Defendant - Appellee, TOTAL S.A.

Roger A. Jatko, Grynberg Petroleum Company, Greenwood Village, Colorado, for Plaintiff - Appellant Jack J. Grynberg; Grynberg Production Corporation and its successors; Grynberg Petroleum Company, and its successors.

Graham Kerin Blair, Baker & McKenzie LLP, Houston, Texas (Marcy G. Glenn and John F. Shepherd, Holland & Hart LLP, Denver, Colorado, and David A. Brakebill and J. Chad Newton, Baker & McKenzie LLP, with him on the briefs), for Defendants - Appellees, Shell Exploration B.V. and Shell International Exploration and Production B.V. f/k/a Shell International Petroleum Maatschappij B.V.

Before **HARTZ**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

**HARTZ**, Circuit Judge.

## I.     INTRODUCTION

Jack Grynberg (Mr. Grynberg), Grynberg Production Corporation, and Grynberg Petroleum Company (collectively, Grynberg) appeal from summary judgments in two separate lawsuits, one against Total S.A. and one against Shell Exploration B.V. and Shell International Exploration and Production B.V.

(collectively Shell). Both lawsuits, which were filed in 2003 in the United States District Court for the District of Colorado as diversity actions, *see* 28 U.S.C. § 1332, raised essentially identical claims based on essentially the same factual allegations. Grynberg alleged that through its special relationship with authorities in the Soviet Union and Kazakhstan, it obtained valuable information regarding potential oil and gas reserves in Kazakhstan. After obtaining authority from Kazakhstan to form a consortium of companies to join with Kazakhstan in exploring for and developing these reserves, Grynberg approached Shell and Total in 1990 with its information and reached agreements on joining a consortium. Shell and Total, however, joined a different consortium and obtained rights to oil and gas in the very area that was to be the subject of the Grynberg consortium. Grynberg's suits against Shell and Total raise against each a tort claim for breach of fiduciary duty and an equitable claim for unjust enrichment. Shell and Total moved for summary judgment on the ground that Grynberg's claims were untimely, barred by the applicable statute of limitations and laches. The district judges granted the motions.

We have jurisdiction under 28 U.S.C. § 1291, consolidate the two appeals, and affirm. The limitations period for Grynberg's tort claims was three years, and well more than three years before Grynberg filed suit it should have known—from news reports and from information disclosed in a settlement with a consortium partner of Shell and Total—that it could have sued Shell and Total for acquiring

-3-

oil and gas interests in the area that Grynberg's consortium was to explore and develop. As for Grynberg's unjust-enrichment claims, they were barred by laches because Grynberg has failed to point to any extraordinary circumstance that would justify extending the laches period beyond the limitations period for the closely allied tort claims.

## II.    THE COMPLAINTS

The allegations at issue on appeal are those in Grynberg's Second Amended Complaint against Shell (the Shell Complaint) and its First Amended Complaint against Total (the Total Complaint), which overlap substantially. They allege the following:

Mr. Grynberg is fluent in Russian and has "extensive knowledge, training and experience in the field of oil and natural gas discovery and development." Shell Compl. at 16; Total Compl. at 13. After a mining convention in September 1989, he helped obtain plane tickets to Washington, D.C., for a Soviet official and his aide who had been bumped from a flight. The official expressed his gratitude and, at Mr. Grynberg's request, invited him to Moscow in early November to review secret seismic data pertaining to the Caspian Sea and Northwestern Kazakhstan. Mr. Grynberg reviewed the data and decided to focus his attention on one particular region (which he calls the Area of Mutual Interest (AMI)) "because of its enormous potential, and because of its inaccessibility to others at that time." Shell Compl. at 12; Total Compl. at 9. The AMI includes "the largest

-4-

oil, natural gas, and sulphur discovery in the world in over 40 years." Shell Compl. at 3; Total Compl. at 2.

Also in November 1989, the United States State Department asked Mr. Grynberg to host a delegation from Kazakhstan that had expressed interest in his cattle-feeding operation. The delegation included First Secretary Nursultan A. Nazarbaev. Mr. Grynberg held a dinner for Nazarbaev, who asked him to assemble teams of experts in the petroleum and mining industries and travel to Kazakhstan to determine whether the region could support those industries. His trip to Kazakhstan in February 1990 confirmed his belief that the AMI had significant potential for oil and natural-gas production. Before returning to the United States, Mr. Grynberg contacted British Gas, British Petroleum, and BP Exploration Operating Company Limited (collectively BP) to discuss the possibility of oil exploration in Kazakhstan.

In April 1990 Mr. Grynberg convinced the President of Venezuela to invite Nazarbaev, who was by then the President of Kazakhstan, to Caracas, where he spent a week with Mr. Grynberg observing western-led oilfield development. During this trip Nazarbaev "reaffirmed his commitment to Grynberg to assist Grynberg in forming an international oil and natural gas consortium to explore, develop and produce oil and natural gas in the AMI of Kazakhstan." Shell Compl. at 13; Total Compl. at 10.

Mr. Grynberg returned to Kazakhstan the next month with a BP executive and a BP team of experts. Nazarbaev permitted Mr. Grynberg to call him by his first name, "indicat[ing] a close relationship, and friendship." Shell Compl. at 14; Total Compl. at 11. At the end of the trip Mr. Grynberg was authorized by a Kazakh government protocol to form an international consortium for oil and gas exploration in the AMI. To allay Nazarbaev's fears that oil exploration could lead to a natural disaster that would harm the Caspian Sea's sizable premium caviar industry, Mr. Grynberg invited a Kazakh delegation to observe Arctic drilling in Alaska. In June he hosted the delegation as it toured the United States, ending in Alaska with a visit to Prudhoe Bay and the Endicott Oil Fields in the Beaufort Sea, which he used as an example of a large offshore operation conducted without polluting the sea.

The visit led to the signing of additional protocols covering development in the AMI. Mr. Grynberg credited his fluency in Russian, close relationship with Nazarbaev and other important players, and his expertise in the oil-and-gas industry (particularly with regard to advances in undersea production) for his success in negotiating with Kazakh and Soviet officials and obtaining the protocols.

In July 1990 Mr. Grynberg proposed to Shell and Total that they join a consortium led by him in partnership with the Republic of Kazakhstan for the purpose of developing "a profitable and potentially gigantic oil and natural gas

industry in the AMI in Kazakhstan." Shell Compl. at 4–5; *see also* Total Compl. at 3–4. Under this proposed consortium agreement, Grynberg was to obtain a 20% working interest in the AMI. The agreement also provided that Grynberg's share of the costs associated with acquiring and developing properties in the AMI would be carried by Shell and Total, who would be reimbursed out of Grynberg's share of future revenue. To convince Shell and Total that oil exploration in the AMI was a viable prospect, Grynberg gave them "access to geologic maps and seismographic data, together with a detailed economic, technical, and scientific analysis," and told them that he believed that "billions of barrels of oil and trillions of cubic feet of natural gas" could be recovered from the AMI. Shell Compl. at 6; Total Compl. at 5.

Shell accepted Grynberg's proposal. Total responded to the proposal in a letter dated July 20, 1990, which stated, "[W]e basically agree on the proposed principles as set out in your draft." Total Compl. at 4. But nothing came of Grynberg's arrangements with Shell and Total, and the complaints skip seven years to 1997, when Shell, Total, BP, and other oil companies signed an agreement with the government of Kazakhstan giving them oil production rights in the AMI. Although Shell and Total thereby profited greatly from Grynberg's efforts, Grynberg was not included in the deal. In 2002 the Kashagan Field in the AMI was declared commercial. The estimated value of each defendant's interest in the entire AMI is $10 billion.

The Shell Complaint summarizes the alleged misconduct as follows:

> [S]everal huge oil companies, including Shell, by their exploration efforts based upon Grynberg's confidential information, were able to determine the value and extent of some of the Kazakhstan oil and natural gas deposits in the AMI. This, they were only able to do as a result of acquiring Grynberg's research, contacts, analysis of confidential scientific data, and organizational skills. Nonetheless, Shell, along with others, later went around Grynberg to Kazakhstan directly, cutting Grynberg out of the entire deal, and profiting by billions of dollars. Shell, and others, then denied Grynberg any compensation whatsoever for his valuable contribution to their assets and profits.

*Id.* at 6. It further states:

> Shell violated its agreement with Grynberg related to this confidential information. The confidential information supplied to Shell by Grynberg, and to other parties to the organization of western oil companies initiated by Grynberg at the behest of the government of Kazakhstan, was specifically provided on condition that Grynberg retained a fair share of the entire deal. Shell breached its agreement with Grynberg, and then waited to enter into its own agreement with others and Kazakhstan to acquire its own interest in the AMI. Shell waited, while ongoing exploration in the AMI confirmed exactly what Grynberg had revealed to Shell in July of 1990, i.e. that the AMI location described contained enormous deposits of oil and natural gas. Then on November 18 of 1997, Shell and others struck a deal with the Republic of Kazakhstan . . . to actually take oil and natural gas production from the Area of Mutual Interest, and to therefore profit immensely from Grynberg's efforts on their behalf.

*Id.* at 7. The Total Complaint contains virtually identical allegations against

Total.

-8-

The Shell and Total Complaints also state virtually identical causes of action.  Neither asserts a claim for breach of contract.  Rather, they each present two other claims.  The first is an equitable claim that Shell and Total were unjustly enriched when they "a) used a benefit provided by Grynberg in an unauthorized and unfair manner; and b) retained that benefit conferred on it by Grynberg without paying fair compensation for it."  Shell Compl. at 24; Total Compl. at 19.  Shell and Total did this by "using Grynberg's contacts, confidential information, and interpretation thereof as aforesaid without paying a penny to Grynberg out of [their] enormous profits."  Shell Compl. at 24; Total Compl. at 19.  The second cause of action is a tort claim for breach of fiduciary duty.  The Shell Complaint alleges that Shell breached "its fiduciary duties to Grynberg in wrongfully using the confidential information imparted to Shell by Grynberg for its own use and profit to the exclusion of Grynberg."  Shell Compl. at 24.  The Total Complaint alleges that

> a) Total obtained confidential information from Grynberg . . . ; b) Total acted as a fiduciary of Grynberg in regard to the confidential information supplied by Grynberg; c) Total breached its fiduciary duty to Grynberg by wrongfully appropriating the confidential information for its own use and profit to the exclusion of Grynberg; and d) Grynberg incurred damages as a result of Total's breach of its fiduciary duties.

Total Compl. at 20.  For relief, both complaints sought, in the alternative, (1) 20% of the fair market value of the defendants' interests, less expenses, in the AMI; (2) a constructive trust on Grynberg's fair share of the defendants' interests in the

entire AMI; or (3) disgorgement to Grynberg of the defendants' profits from the AMI.

## III.   SUMMARY JUDGMENT PROCEEDINGS

Grynberg filed the lawsuits in July 2003.  Both Shell and Total raised in their answers the affirmative defenses of the statute of limitations and laches, and the parties filed cross-motions for summary judgment.  The parties agreed, at least at that stage of the proceedings, that the applicable limitations period was three years.  Although the evidence in the two cases overlaps, we will discuss them separately because the parties presented different evidence and raised different arguments.

### A.   Shell

Both Shell and Grynberg submitted numerous exhibits to support their positions.  These exhibits established the following series of events:  In June 1990 the government of Kazakhstan executed several protocols with Grynberg, BP, and other oil companies (but not Shell or Total), purporting to give (1) Grynberg authority to form a consortium and (2) BP rights to study exploration and production "in the Pricaspian Basin of Northwest Kazakhstan."  Shell App. Vol. II at 364 (June 1990 Protocol at 1).  On May 31, 1991, Grynberg and BP Exploration executed an agreement (the BP Agreement) stating that if either Grynberg or BP Exploration obtained an opportunity to "participate in any petroleum exploration, development, production, processing and transportation

-10-

opportunities" within the AMI, it was to share the offer with the other party, and the parties could either jointly accept the offer, or one could decline and the other could accept the offer. *Id.* Vol. III at 764 (BP Agreement at 2). Notwithstanding the 1990 protocols, the government of Kazakhstan executed in 1993 two consortium agreements with oil companies, including subsidiaries of BP, Shell, and Total. The first agreement, called the "Preliminary Consortium Agreement" (PCA), was executed on June 9, 1993. *Id.* Vol. I at 111 (1997 Agreement). The second agreement, called the "Consortium Agreement" (CA), was executed on December 3. *Id.* at 112. The primary purpose of the CA was to implement an "exploration research study" to obtain and interpret seismic and other geologic data and to assess the environmental impact of oil production. *Id.* at 270. In return for their payments and exploration efforts, the foreign companies were to receive "the exclusive right to select a number of E&P [Exploration and Production] Blocks . . . and to negotiate the terms and conditions for the exploration and production of such E&P Blocks." *Id.* at 112.

Grynberg was not a party to either agreement. But the involvement of Shell, Total, and other oil companies was not secret. Several prominent newspapers carried articles describing the PCA, and identifying BP, Shell, and Total as participants. On June 8, 1993, the day before the PCA was signed, the Wall Street Journal reported that several oil companies were preparing to enter an agreement to perform exploratory work toward developing oil fields in the

Caspian Sea in Kazakhstan. On June 10 the paper published a follow-up article stating that the agreement had been signed, that it addressed only exploration, and that production was not projected to begin until 2000. The New York Times reported on June 9 that the purpose of the agreement was to begin "a seismic exploration program" and that the agreement was "preliminary" and would be followed by a "final agreement" in the fall. *Id.* Vol. II at 526. Also on June 9, the Financial Times stated that the purpose of the agreement was seismic exploration, that a final agreement was to be formed as early as the fall, and that the participating oil companies, in return for financing the surveys and paying a fee to the Kazakh government, would have a right of first refusal to exploit any oil that was discovered. The Los Angeles Times reported on June 10 that a consortium had been formed to explore the Caspian Sea in Kazakhstan. According to the article, after Kazakhstan's entire shelf in the Caspian Sea was surveyed, each participant would be allowed to select blocks in which it would have exclusive rights to the oil.

Later in 1993 the CA also received widespread publicity. On December 6 the New York Times reported that "Kazakhstan signed a final agreement . . . with seven Western companies to explore for oil in the northern part of the Caspian Sea shelf." *Id.* Vol. II at 531. It identified BP, Shell, and Total as among the signatories. Lloyd's List International stated on December 4 that a final agreement had been reached that included BP, Shell, and Total, and that

development and production would not occur until after 2000.  None of this 1993 news coverage, however, used either the name *Kashagan Field* or *Tazhigali Offshore* (the term originally used by Mr. Grynberg for the Kashagan Field).

Although Mr. Grynberg initially testified in his deposition that television is his primary source of news and business information, that he did not read regular periodicals from 1993 to 2003, and that he never saw reports of the 1993 CA, he then admitted that he had written a letter referring to the June 10, 1993, Wall Street Journal article.  The letter, addressed to a BP executive, said:

> Congratulations on the Caspian Sea agreement.  After all this hard work I am delighted it has finally come through for all of us.  Based on the article in today's Wall Street Journal let's hope this effort will result in the discovery of the world's greatest oil accumulation.

*Id.* Vol. III at 1031.

Two months earlier Grynberg had sued British Gas in Texas state court for breaching its August 1990 agreement with Grynberg relating to oil and gas rights in the AMI, and for fraud, breach of fiduciary duty, and breach of confidentiality. The suit also sought a declaratory judgment against BP Exploration and others to establish that any rights they had in the AMI were rights against British Gas (not Grynberg).  After receiving Mr. Grynberg's congratulatory letter, BP Exploration sued Grynberg in the Southern District of New York, alleging that the 1991 BP Agreement superseded an earlier agreement and was itself unenforceable because it had been terminated by its own terms, the purpose had been frustrated, and

-13-

performance had been rendered impossible. In the alternative, BP Exploration alleged that Grynberg had breached its obligations (1) under its August 1990 agreement with British Gas, under which BP Exploration was an intended beneficiary; and (2) under the 1991 BP Agreement. We will refer to this pair of lawsuits as the BP Litigation. (Although the BP Litigation eventually settled, the settlement agreement is not part of the record in the Shell Case.)

On November 18, 1997, four years after the CA was signed, Kazakhstan signed a "Production Sharing Agreement" (PSA) covering "The North Caspian Sea (Kashagan)" with several oil companies, including BP, Shell, and Total. *Id.* Vol. I at 100 (1997 PSA). The agreement was signed in Washington, D.C., in the presence of Nazarbaev and Vice President Gore. In an affidavit Mr. Grynberg stated that he obtained a copy of the PSA only in January 2002. But, again, there was extensive contemporaneous news coverage. About seven weeks before the PSA was signed, the Wall Street Journal carried an article stating that six oil companies (including BP, Shell, and Total), having spent $300 million on a seismic survey, were planning to enter a production-sharing agreement with Kazakhstan for the Kazakh sector of the Caspian Sea. The day the agreement was signed, articles in the New York Times and the Financial Times stated that BP, Shell, and Total were going to sign a production-sharing agreement with Kazakhstan. The New York Times article identified the Kashagan Field by name. The Financial Times article referred to the area involved as the Kazakhstan sector

of the North Caspian Sea. In the days that followed, at least four other periodical articles reported on the subject and named BP, Shell, and Total. One of these articles, in Europe Energy, said that the project's development costs were likely to exceed $20 billion, and referred specifically to Kashagan; the other three referred only to the North Caspian Sea.

Grynberg argued that the evidence presented on the motions for summary judgment did not establish that the Shell Complaint was untimely. It contended that the three-year limitations period could not begin until it incurred damages; that it could not incur damages until a field had been declared commercial; and that the Kashagan Field was not declared commercial until June 28, 2002, barely a year before Grynberg filed suit. Moreover, argued Grynberg, even if its causes of action could have been brought on July 24, 2000, when the first oil discovery in the Kashagan Field was publicly announced, the lawsuit was still filed within three years of that date. With regard to laches, Grynberg contended that because the lawsuit was brought within the time period established by the analogous statute of limitations, it would be barred by laches only if Shell could prove extraordinary circumstances, which it had not done.

Shell contended that Grynberg's claims accrued as soon as it knew (or should have known) the facts underlying its claims, and that this had occurred by 1993, or at the latest by 1997. According to Shell, Grynberg had acquired the necessary knowledge from the BP Litigation and from Mr. Grynberg's admitted

reading of the 1993 Wall Street Journal article reporting that Shell, BP, Total, and others, had signed an agreement "to begin exploration of a potentially huge oil field in the Caspian Sea north of Iran." Shell Cross-Mot. Summ. J. at 8, March 6, 2006 (internal quotation marks omitted). And, Shell continued, Grynberg should have known the necessary facts from the news accounts on the matter, its access to Kazakh officials, and its ability to contact Shell itself.

Responding to Grynberg's argument on laches, Shell said that it did not need to prove extraordinary circumstances because the suit was not filed within the analogous limitations period. Alternatively, it contended that extraordinary circumstances existed because (1) Grynberg had not filed suit until 13 years after Mr. Grynberg's only meeting with Shell, (2) Grynberg had admittedly lost "numerous boxes of important documents" pertaining to the lawsuit, and (3) the Shell representatives who had met with Mr. Grynberg and almost all those with personal knowledge of the material events were no longer Shell employees. Shell App. Vol. II at 474 (Shell Mem. of Law in Opp'n to Pls.' Mot. Summ. J. at 20, March 6, 2006).

Grynberg in turn replied that Shell had failed to show prejudice from delay, contending that Shell could still obtain the testimony of its former employees, but not addressing Shell's claims of prejudice from Grynberg's loss of important records.

The district court granted Shell summary judgment. It ruled that Grynberg was injured when Shell entered a consortium in 1993 in reliance on the information provided by Grynberg, or, at the latest, in 1997 when Shell and others planned commercial development of the Kashagan Field. The court also ruled that Grynberg should have discovered the requisite injury in November 1997, when newspapers reported that a consortium including Shell "had agreed to develop the Kashagan Field for commercial purposes." Mem. Op. & Order (on Summ. J.) at 7, 9, June 6, 2006. The court concluded that Grynberg's breach-of-fiduciary-duty and unjust-enrichment claims were both barred under the three-year limitations period which applied "under the statute [of limitations] and the correlating laches doctrine." *Id.* at 1–2.

On June 16, 2006, Grynberg filed a motion under Federal Rule of Civil Procedure 59(e) to alter or amend the judgment. It argued that the unjust-enrichment claim, which was governed by laches, was not untimely because the limitations period under the analogous statute of limitations was six years. The district court denied the motion on the ground that a party may not use a Rule 59(e) motion to raise new issues that could and should have been presented before entry of judgment.

B.    Total

The exhibits submitted by Total in support of its motion for summary judgment were more extensive than those submitted by Shell. In addition to the

Shell materials, Total submitted copies of the 1993 CA, the 1997 PSA, and the 1999 settlement agreement between Grynberg and BP (the BP Settlement Agreement) to resolve the BP Litigation. The 1999 BP Settlement Agreement states that BP, Shell, and Total, among others, were parties to a "Production Sharing Agreement in Respect of the North Caspian Sea, dated as of November 18, 1997, to Engage in Exploration and Production." Total App. Vol. VI at 1969. The Statement of Undisputed Material Facts in Total's motion asserts that the AMI set forth in Grynberg's 1990 letter to Total "matched, by latitude and longitude, the boundaries of the North Caspian Sea then claimed by and now defined to be within Kazakhstan," and attached a sworn statement and map prepared by a cartographer. *Id.* Vol. V at 1462. This assertion was uncontested, as Grynberg's response (which would have been more appropriate in an answer to a complaint) states only that it "is without knowledge to admit or deny the boundaries of the North Caspian Sea then claimed by and now defined to be within Kazakhstan." *Id.* Vol. IV at 1040. A fact is "disputed" in a summary-judgment proceeding only if there is contrary evidence or other sufficient reason to disbelieve it; a simple denial, much less an assertion of ignorance, does not suffice. *See* Fed. R. Civ. P. 56(e); *Trevizo v. Adams*, 455 F.3d 1155, 1159–60 (10th Cir. 2006).

As in the Shell Case, Grynberg argued that its claims had not arisen until the Kashagan Field was declared commercial in 2002, because it had not been

-18-

injured until then:  if the exploratory wells had been dry, Grynberg reasoned, it "would have had nothing on which to claim an interest."  Pls.' Cross-Mot. Summ. J. at 6, Dec. 16, 2005.  At the earliest, argued Grynberg, the clock started on July 24, 2000, when the first oil discovery was publicly announced, still less than three years before it filed suit.  In the alternative, Grynberg contended that even if it could have sued Total for entering the PSA in 1997, the limitations period did not begin to run on that claim until 2002, when it first obtained a copy of the PSA, because it had not known before then that Total itself was exploiting areas within the AMI.  Grynberg asserted that the BP Settlement Agreement had not revealed which blocks of the Caspian Sea were being exploited by Total or whether Total had used confidential information from Grynberg.  Grynberg also contended that both the breach-of-fiduciary-duty claim and the unjust-enrichment claim were equitable claims governed by laches, and that Total had not established laches because  suit had been brought within the analogous limitations period and Total had failed to prove prejudice from delay.

Total's legal theory was that Grynberg's causes of action accrued as soon as Grynberg knew or should have known that Total (1) had exploration and production rights, (2) within the AMI, (3) to the exclusion of Grynberg. According to Total, all three elements were satisfied by the time that Grynberg executed the BP Settlement Agreement on January 19, 1999, more than three years before Grynberg sued Total.  In particular, the agreement stated that Total

-19-

had production rights in the Kazakh sector of the North Caspian Sea, all of which, asserted Total, is within the AMI. Total further argued that Grynberg's claims had accrued even earlier, when Total's commercial interest in the AMI had been widely publicized in 1997. Total contended that although Grynberg's claim for unjust enrichment was governed by laches, Grynberg could overcome a laches bar only by showing extraordinary circumstances because it had filed suit outside of the analogous three-year limitations period. In a later pleading Total argued that claims for unjust enrichment are governed directly by the statute of limitations, but Total also contended that it was prejudiced by Grynberg's delay because it no longer employed certain key people, memories had faded, and it had lost track of relevant documents.

Grynberg replied that Total had not established prejudice, pointing out that (1) Total still employed most of the people involved in developing the Kashagan Field, (2) it could not explain how it was prejudiced by the loss of documents because it could not describe their contents, and (3) it did not know whether an unlocated former employee would testify in its favor.

The district court granted summary judgment for Total, ruling that Grynberg's causes of actions accrued by 1999, when Grynberg should have known that Total had obtained production rights in the AMI to the exclusion of Grynberg. The court rejected Grynberg's argument that it could not have brought a claim before the Kashagan Field was declared commercial.

On June 16, 2006, Grynberg filed a motion to alter or amend judgment under Rule 59(e). It argued that its unjust-enrichment claim was governed by laches and that the limitations period under the analogous statute of limitations was six years, not three. The district court denied the motion because Grynberg was making a new argument that it could have previously raised. It also rejected the argument on the merits.

## IV. DISCUSSION

We review a district court's decision to grant summary judgment de novo, viewing all facts in the light most favorable to the party opposing summary judgment. *See Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004). We will affirm a grant of summary judgment if there is no genuine dispute of material fact and the prevailing party is entitled to judgment under the law. *See id.* at 426; Fed. R. Civ. P. 56(c). Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption. *See St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*, 309 F.3d 680, 703 (10th Cir. 2002) (assuming that Oklahoma law applies because parties assumed that it did). We will first address Grynberg's claims for breach of fiduciary duty and then the unjust-enrichment claims. We hold that there is no genuine dispute regarding facts that establish that Grynberg's claims are time-barred.

### A. Breach of Fiduciary Duty

The parties do not dispute that the limitations period for a claim of breach of fiduciary duty is three years from when the claim accrues. *See* Colo. Rev. Stat. § 13-80-101(1)(f). To establish a claim under Colorado law for breach of fiduciary duty, a plaintiff must prove (1) that it was justified in reposing trust or confidence in the other party, or that the other party invited, accepted, or acquiesced in that trust; (2) that the other party assumed a primary duty to represent the plaintiff's interest in a transaction; (3) that the nature and scope of the duty extended to the subject matter of the claim; and (4) that it was damaged by the trustee's breach of that duty. *See Equitex, Inc. v. Ungar*, 60 P.3d 746, 752 (Colo. Ct. App. 2002).

Although the fourth element refers to "damage," it does not require that the plaintiff actually be worse off; it also encompasses any benefit that the defendant wrongfully obtained. The Restatement (Second) of Torts § 874 cmt. b (1979) states that the remedies for breach of fiduciary duty include "restitutionary recovery," and cites, among other things, the Restatement (First) of Restitution §§ 138 and 190 (1937). Section 138(1) states that "[a] fiduciary who has acquired a benefit by a breach of duty as fiduciary is under a duty of restitution to the beneficiary." And § 190 states that "[w]here a person in a fiduciary relation to another acquires property, and the acquisition or retention of the property is in violation of his duty as fiduciary, he holds it upon a constructive trust for the other." In accord with the Restatements, the Colorado Uniform Jury Instruction

for damages with respect to a claim for breach of fiduciary duty includes as a possible component of damages: "[a]nything of value or any profit the defendant . . . received as a result of the breach of fiduciary duty." Colo. Jury Instrs., Civil ch. 26:5(2)(a), (c) (4th ed. 2007); *see TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1182 (10th Cir. 2007) (noting that Colorado jury instructions are promulgated by state supreme court).

The Shell Complaint alleges that Shell "wrongfully us[ed] the confidential information imparted to Shell by Grynberg for its own use and profit to the exclusion of Grynberg." Shell Compl. at 24. The Total Complaint is essentially the same, alleging that "Total breached its fiduciary duty to Grynberg by wrongfully appropriating the confidential information [obtained from Grynberg] for its own use and profit to the exclusion of Grynberg." Total Compl. at 20. The only issue before us on appeal is when Grynberg knew or should have known that it could bring claims against the defendants for benefitting from the appropriation of the confidential information it had provided.

Grynberg's position on appeal appears to be that it had no cause of action until it knew that a defendant had a production interest in the specific area within the AMI that Mr. Grynberg had pinpointed to the defendants—namely, the Kashagan Field. This might follow if its claim had been solely that the defendant would breach a duty to Grynberg if it used confidential information from Grynberg to obtain an interest in the Kashagan Field (as opposed to the entire

-23-

AMI). But that was not Grynberg's theory below. Both complaints alleged that the involvement of Shell or Total anywhere in the AMI was a breach of fiduciary duty owed to Grynberg. Accordingly, whenever either defendant benefitted from involvement in the AMI, Grynberg could have brought its claim against that defendant for breach of fiduciary duty. It was on this basis that Grynberg sought 20% of the defendants' interests in the *entire* AMI. Grynberg did not argue during the summary-judgment proceedings that it had a claim against Shell or Total only if that defendant had an interest in the Kashagan Field. Nor did it argue below, as it does on appeal, that its claim is essentially one for misappropriation of a trade secret (the information that Grynberg allegedly conveyed regarding the Kashagan Field). We need not consider a legal theory raised for the first time on appeal. *See Carpenter v. Boeing, Co.*, 456 F.3d 1183, 1198 n.2 (10th Cir. 2006). Therefore, we examine only when Grynberg knew or should have known that Shell or Total had obtained a benefit from an interest somewhere in the AMI.

This examination is a two-part process. First we determine when the defendants obtained a benefit. Then we determine when Grynberg should have known of that benefit. Colorado has endorsed a broad view of benefit in the context of restitutionary recovery.

> "A person confers a benefit upon another if he gives to
> the other possession of or some other interest in money,
> land, chattels, or choses in action, performs services

-24-

> beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage. He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss. *The word 'benefit,' therefore, denotes any form of advantage.*"

*Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Ass'n*, 649 P.2d 1093, 1097 (Colo. 1982) (en banc) (emphasis added) (quoting Restatement (First) of Restitution § 1 cmt. b (1937)). By this standard it would seem that Shell and Total had received a benefit as soon as they entered their first consortium agreements with Kazakhstan in 1993. Both Shell and Total understandably thought that membership in the consortium was "advantageous" to them, something worth the obvious expenditures that would be required. But we need not resolve that matter. It is enough that participation in the 1997 PSA was a benefit to each of them. Grynberg's complaints allege the undeniable: "[O]n November 18 of 1997, Shell [, Total,] and others struck a deal with the Republic of Kazakhstan . . . to actually take oil and natural gas production from the Area of Mutual Interest, and to therefore profit immensely . . . ." Shell Compl. at 7; Total Compl. at 6. The 1997 deal was worth a fortune.

As for Grynberg's knowledge, in the Shell Case the district court ruled that newspaper articles established that Grynberg knew or should have known of the breach of fiduciary duty in 1993, when Shell's involvement in the exploratory consortium became public (and Grynberg knew that it was not a party to that

-25-

consortium), or at the latest in 1997, when newspapers reported that a consortium including Shell was going to exploit the Kashagan Field commercially. In the Total Case the court ruled that documents from the BP Litigation established that Grynberg knew or should have known in 1999 that Total had a commercial interest in the AMI. We address the Shell decision first, and then the Total decision.

### 1.    Shell

In our view, there can be no dispute that Grynberg knew or should have known by the end of 1997 that Shell was a participant in the 1997 PSA. Mr. Grynberg admits that in 1993 he read a Wall Street Journal article stating that Shell and BP, among others, were involved in an exploratory consortium in Kazakhstan. Based on that article, he wrote a letter to BP exclaiming that their "hard work . . . ha[d] finally come through for all of us." Shell App. Vol. III at 1031. Articles published in 1997 in the New York Times, the Wall Street Journal, the Financial Times, and Europe Energy, among others, identified Shell as a member of a commercial consortium in Kazakhstan for oil exploration in an area that probably, if not certainly, overlapped the AMI. Two (in the New York Times and Europe Energy) mentioned the Kashagan Field by name, one (in the Financial Times) referred to the Kazakh Sector of the North Caspian Sea, and the others simply referred to the North Caspian Sea.

Grynberg argues that the articles are irrelevant because they contained "inconsistent and . . . insufficient detail" and he did not read them. Shell Aplt. Br. at 22. We disagree. First, Mr. Grynberg does not explain in what ways the articles were inconsistent or insufficient; he merely asserts that they were. Yet all identify BP, Shell, and Total as parties to the commercial agreement, and all point to the North Caspian Sea (or more specifically the Kashagan Field) as a subject of the agreement. Second, it strains credulity that a person of Mr. Grynberg's self-described experience, expertise, and worldliness, with a financial interest worth millions of dollars, or even tens or hundreds of millions, could not, with reasonable diligence, learn of matters reported in the leading business newspapers circulated in this country. How could any reasonable person with Grynberg's expertise, resources, and financial interest have remained ignorant of an agreement relating to oil exploration in the Kazakh portion of the North Caspian Sea that was signed in Washington, D.C., in the presence of Mr. Grynberg's "friend" Nazarbaev and Vice President Gore? To the extent that any particular article did not provide complete information, it still would have caused a reasonable person in Grynberg's position to pursue the matter, eventually obtaining the publicly available information that Shell was party to a production-sharing agreement with respect to oil and gas reserves in the AMI. Grynberg contends that a jury might have believed that it exercised reasonable diligence, but we disagree that a *rational* jury could have reached that conclusion. *See*

*Carpenter*, 456 F.3d at 1192 (issue is genuine only if a reasonable jury could find in nonmovant's favor).

Colorado case law supports the view that sophisticated business people can be expected to check public information. In *Skyland Metropolitan District v. Mountain West Enterprise*, LLC, 184 P.3d 106 (Colo. Ct. App. 2007), the court held that claims by developers challenging the assessment of fees against their property were time-barred. The relevant information on which the claims were based had been "publicly available and obtainable in the exercise of reasonable diligence," particularly in light of the developer's experience and sophistication. *Id.* at 127. Also, more generally, several of our sister circuits have held that "'[w]here events receive . . . widespread publicity, plaintiffs may be charged with knowledge of their occurrence.'" *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000) (quoting *United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980)). *Accord Patterson v. United States*, 451 F.3d 268, 271 (1st Cir. 2006) (cause of action accrued when FBI's involvement in plaintiffs' father's death received widespread publicity); *In re Briscoe*, 448 F.3d 201, 223–24 (3d. Cir. 2006) (plaintiffs had a "reasonable opportunity to discover the alleged wrong" due to "extensive publicity" regarding dangerous diet drugs that injured them (internal quotation marks omitted)); *Fulcher v. United States*, 696 F.2d 1073, 1077 (4th Cir. 1982) ("prudent landowner exercising reasonable diligence

should . . . have discovered the government's open and notorious occupation of the land" because of "extensive publicity and discussion.").

Grynberg cites cases in which general publicity was held inadequate to establish that a plaintiff should have known of the cause of action, but the cases are readily distinguishable because of the lack of expertise of the plaintiff or imprecision of the public information. In *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1383 (10th Cir. 1985), the plaintiffs sued a uranium mill for wrongful death, alleging that the mill had caused leukemia that killed their children and spouses. We held that "the mere fact that there were public statements concerning the possible link between radiation and leukemia is not enough to establish, as a matter of law, that the plaintiffs should have known that emissions from the uranium processing plant . . . were the likely cause of the leukemia." *Id.* at 1388. "Nor can it be said," we added, "that [as a matter of law] the average layman would understand, after reading that fall-out from atomic bombs causes cancer**,** that the local uranium mill may have caused . . . leukemia." *Id.* Further supporting this court's holding was that the doctors who had been consulted by the plaintiffs' decedents did not correlate the leukemia with the mill. *See id.* at 1389. No similar scientific uncertainty or lack of expertise hampered Grynberg. *See also Alexander v. Oklahoma*, 382 F.3d 1206, 1216 n.4 (10th Cir. 2004) (distinguishing *Maughan* on similar grounds).

Even easier to distinguish is *Cook v. Rockwell International Corp.*, 755 F. Supp. 1468, 1476, 1483 (D. Colo. 1991), which held that publicity about pollution at Rocky Flats was insufficient to notify plaintiffs that their property was polluted and they had been exposed to hazardous substances; there was no evidence regarding when the plaintiffs should have known that this pollution had extended to their properties, some of which were six miles from Rocky Flats.

Grynberg also cites two other cases apparently to support its position on this issue, but it provides no analysis or discussion. In the first, *O'Connor v. Boeing North American, Inc.*, 311 F.3d 1139, 1143 (9th Cir. 2002), plaintiffs alleged that they had been harmed by exposure to radioactive and nonradioactive substances released from rocket-testing facilities. Boeing argued that plaintiffs' claims were time-barred because there had been general publicity regarding cancer and specific publicity regarding Boeing's facilities. The court held that this publicity was not sufficient to put plaintiffs on notice that Boeing caused their cancer, because the extent of publicity was unclear, there were multiple possible causes for their illnesses, and, as in *Maughan*, the plaintiffs were under the care of doctors who did not make the connection between their cancers and the defendant's facilities. *See id.* at 1151–55. In the second case, *Williams v. Stewart*, 112 P.3d 281, 283–84 (N.M. Ct. App. 2005), plaintiffs were family members of decedents whose organs had been removed and tested by the Los Alamos National Laboratory for plutonium content, without the informed consent

of the decedents or their families.  The Laboratory argued that plaintiffs' claims accrued when the plutonium-testing program received publicity, but the appellate court ruled that whether plaintiffs were diligent was a question of fact.  *Id.* at 286–87.  The court noted questions concerning which publications would have been widely circulated where the plaintiffs lived and that many of the articles omitted the important information (such as the failure to obtain informed consent) that would have alerted the plaintiffs to their claims.  In contrast, the publicity related to the PSA was sufficiently specific and widely circulated that a reasonable person with Grynberg's expertise and financial stake would have been adequately informed.

Finally, Grynberg cites two readily distinguishable Colorado opinions that do not concern the effect of widespread publicity.  In *Salazar v. American Sterilizer Company*, 5 P.3d 357, 362–64 (Colo. Ct. App. 2000), the court ruled that Salazar's cause of action did not accrue until a toxicological report diagnosed her peripheral neuropathy as being caused by ethylene oxide, even though prior doctors had told her that the chemical was a possible cause.  *Salazar* is inapposite because, like the cancer cases discussed above, it involved an unsophisticated layperson.  The second case, *Financial Associates, Ltd. v. G.E. Johnson Construction Co., Inc.*, 723 P.2d 135, 138–40 (Colo. 1986) (en banc), was a suit alleging a design defect.  Various expert reports stated that the damage to the plaintiff's building had several possible causes, but a design defect was not

mentioned. The court held that the cause of action did not necessarily accrue before the plaintiff received a report attributing the damage to the design defect. We fail to see any help for Grynberg in this decision.

### 2. Total

In the Total Case the district court ruled that there was no genuine issue of disputed fact that Grynberg's cause of action accrued by the time of the BP Settlement Agreement in 1999 because the text of the agreement revealed that Total, among others, had entered a production sharing agreement with respect to the North Caspian Sea in Kazakhstan. The court stated that "the AMI . . . covers the entire Kazakh sector of the North Caspian Sea and, therefore, the area referenced in the PSA as the 'North Caspian Sea' necessarily falls within the areas covered in the AMI." Order on Mots. for Summ. J. at 13, May 31, 2006. We agree. Moreover, we have already held that the 1997 news articles showed that Grynberg should have known of its cause of action against Shell, and these articles were also produced by Total and mention Total's involvement as much as Shell's.

Grynberg argues that it did not realize in 1999 that Total had an interest specifically in the Kashagan Field. But, as we have already explained, such knowledge was not necessary for Grynberg's cause of action. The precise location of Total's interest within the AMI was irrelevant.

Grynberg further contends that a reasonable jury could conclude that it was diligent in its efforts to learn of Total's involvement in the region. It argues that it had no duty to ask Total whether it was involved in the AMI because it was entitled to trust Total based on their fiduciary relationship, even though it had not communicated with Total since 1990. But diligence is not at issue because by the time of the 1999 BP Settlement Agreement, Grynberg had all the information it needed to bring its cause of action; further investigation was unnecessary.

Grynberg also argues that Total engaged in fraudulent concealment to prevent him from learning of Total's breach of fiduciary duty. Fraudulent concealment tolls the statute of limitations. *See First Interstate Bank v. Piper Aircraft Corp.*, 744 P.2d 1197, 1200 (Colo. 1989) (en banc). But in district court Grynberg merely asserted such fraud, providing no evidence, or even argument, on the point. "[W]here an issue is raised but not pursued in the trial court, it cannot be the basis for the appeal." *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 722 (10th Cir. 1993).

## B. Unjust Enrichment

Grynberg's unjust-enrichment claims against Shell and Total were dismissed as barred by the statute of limitations and the doctrine of laches. Unjust enrichment occurs when "(1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for the defendant to retain the benefit . . . ." *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000)

(en banc).  As we understand Grynberg's complaints, the unjust-enrichment claims are predicated on the same alleged misconduct—a breach of fiduciary duty, primarily arising from the use  of confidential information—as the breach-of-fiduciary-duty claims.  This is a well-established type of unjust-enrichment claim.  *See* Restatement (Third) of Restitution § 43 (Tentative Draft No. 4, 2005) (discussing unjust-enrichment claims based on breach of fiduciary duty).  Indeed, it appears to us that Grynberg's unjust-enrichment claims are identical to its breach-of-fiduciary-duty claims.  There is no practical difference between (1) a tort claim for breach of a fiduciary duty in which the plaintiff seeks disgorgement of (or a constructive trust on) profits or property and (2) an unjust-enrichment claim in which the enrichment is claimed to be unjust because it was accomplished through a breach of fiduciary duty.  *See* Andrew Kull, *Rationalizing Restitution*, 83 Cal. L. Rev. 1191, 1222–26 (1995) (Although recognizing that there is no practical difference, the author emphasizes that in this context unjust-enrichment doctrine provides a conceptual basis for a substantive claim of wrongful retention of a benefit and does not merely provide an additional means of recovery for the tort.); *cf. Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1006–08 (Colo. 2008) (en banc) (governmental immunity from actions in tort encompasses unjust-enrichment claim arising out of tortious conduct).  As do the parties, however, we will treat the claims separately.

The parties dispute when the defendants received the benefit that would establish Grynberg's claim of unjust enrichment. The defendants contend that the requisite benefit would be a valuable interest in the AMI. Grynberg contends that (1) the defendants' interest would have to be a production interest located specifically in the Kashagan Field and (2) that interest would not be unjustly retained by a defendant until the defendant began receiving profits that would have to be shared with Grynberg under their 1990 agreements. We agree with Shell and Total.

First, as previously discussed in relation to Grynberg's breach-of-fiduciary-duty claims, Grynberg's complaints can only be read as claiming an entitlement to a share of the defendants' benefits throughout the entire AMI, not just the Kashagan Field. The theory of the complaints is that any involvement of the defendants in the AMI is an exploitation of their breach of a fiduciary duty—the use of confidential and valuable information provided by Grynberg. Thus, the unjustly retained interest need only be somewhere within the AMI; it is not restricted to the Kashagan Field.

Second, any benefit retained by Shell or Total in the AMI would constitute unjust enrichment. Under Colorado law, in this context a benefit is "'any form of advantage.'" *Cablevision*, 649 P.2d at 1097 (quoting Restatement (First) of Restitution § 1 cmt. b). Grynberg argues that the defendants would not have done anything improper—and therefore would not be unjustly enriched—until they

-35-

refused to pay Grynberg as required by their 1990 agreements, namely, when they started receiving profits from production of oil and gas in the AMI. But that analysis would be proper only if Grynberg were suing for breach of contract. If it were, one could say that a breach has not occurred until a defendant has not performed under the contract, and neither Shell nor Total owed any duty of performance until it started earning profits from production. Grynberg's complaints, however, do not allege breach of contract. They allege unjust enrichment, and the benefit to a defendant is what matters, not the breach of a promise to pay that is not the basis of the claim. The defendants were unjustly enriched, according to the theory of the complaints, when they obtained a benefit by appropriating Grynberg's confidential information and efforts. Accordingly, Grynberg had an unjust-enrichment claim when Shell or Total obtained a benefit—a valuable interest—in the AMI. And, as we explained in discussing the breach-of-fiduciary-duty claims, Shell and Total certainly had such an interest when they executed the PSA in 1997.

The traditional rule for equitable claims, such as a claim for unjust enrichment, is that timeliness is determined under the doctrine of laches. *See Interbank Invs., LLC v. Vail Valley Consol. Water Dist.*, 12 P.3d 1224, 1229–30 (Colo. Ct. App. 2000). The elements of laches in Colorado are: "(1) full knowledge of the facts; (2) unreasonable delay in the assertion of available remedy; and (3) intervening reliance by and prejudice to another." *Manor Vail*

*Condo. Ass'n v. Vail*, 604 P.2d 1168, 1170 (Colo. 1980) (en banc) (internal quotation marks omitted). But the traditional rule must yield to legislative authority and may yield, at least in part, to legislative policy. As we proceed to explain, the Colorado statute of limitations may well be itself controlling in this case, either on its own or in conjunction with established doctrine. And even if the statute is not controlling, the Colorado rule that would then apply requires dismissal of Grynberg's claims.

First, Colorado's three-year statute of limitations on its face applies to Grynberg's restitutionary claim. It states:

> The following civil actions, *regardless of the theory upon which suit is brought,* or against whom suit is brought, should be commenced within three years after the cause of action accrues, and not thereafter:
>
> . . .
>
> (f) All actions for breach of trust or breach of fiduciary duty

Colo. Rev. Stat. § 13-80-101(1) (emphasis added). *See Hersh Companies Inc. v. Highline Village Assocs.*, 30 P.3d 221, 223–24 (Colo. 2001) (en banc) (whether claim falls within statute-of-limitations provision depends on nature of the claimed right, not the form of action or relief sought). Because Grynberg's unjust-enrichment claims are founded on allegations of breach of fiduciary duty, the claims are encompassed by the statute. Although one might try to argue that the statutory provision governs only actions at law, not suits in equity, the

language "regardless of the theory upon which suit is brought" undermines the argument.

Second, even if the statute explicitly applied only to actions at law, compelling authority would require application of the statute here because the only difference between Grynberg's legal and equitable claims is the relief sought. In *Cope v. Anderson*, 331 U.S. 461, 463–64 (1947), the Supreme Court wrote:

> Even though these suits are in equity, the states' statutes of limitations apply. For it is only the scope of the relief sought and the multitude of parties sued which gives equity concurrent jurisdiction to enforce the legal obligation here asserted. And equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy.

*See* Douglas Laycock, Modern American Remedies 1003 (3d. ed. 2002) (describing this "concurrency" doctrine and providing the example of a suit for breach of contract and a suit for specific performance, which seek two remedies for the same substantive wrong, a breach of contract). If the legislature has determined that three years is sufficient time to sue for a breach of fiduciary duty, that determination could be undermined by permitting less timely claims for such breach when only equitable remedies are sought.

Third, even if the statute is not controlling, the Colorado law that would then apply still gives great weight to the statutory period. A recent decision of the Colorado Court of Appeals stated the following rule: "Absent extraordinary

-38-

circumstances, . . . a court '"will usually grant or withhold relief in analogy to the statute of limitations relating to actions at law of like character."'" *Interbank*, 12 P.3d at 1230 (quoting *Brooks v. Bank of Boulder*, 911 F.Supp. 470, 477 (D. Colo. 1996) (quoting *Shell v. Strong*, 151 F.2d 909, 911 (10th Cir. 1945)).  To be sure, as Grynberg argues, we are not bound by decisions of state intermediate appellate courts when we apply state law in a diversity case; rather, we are to follow decisions of the state's highest court, or, when none is in point, predict how it would rule on the issue.  *See Pompa v. Am. Family Mut. Ins. Co.*, 520 F.3d 1139, 1142 (10th Cir. 2008).  But *Interbank* is not contrary to any Colorado Supreme Court decision, and we see no reason to believe that the state supreme court would adopt a rule more favorable to Grynberg than the *Interbank* rule.  *See Stickley v. State Farm Mut. Auto Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007) (we will not disregard an intermediate state court's decision unless we are "convinced by other persuasive data that the highest court of the state would decide otherwise.").  The *Interbank* rule is in accord with a "modern view" that in litigious times, certainty is a virtue.  Rather than making an individualized assessment of the laches factors in each case, a court can rely on a precise statute of limitations for analogous claims, although—after all, we are dealing with equitable relief—extraordinary circumstances may provide an avenue of escape. *See generally,* Gail L. Heriot, *A Study in the Choice of Form: Statutes of Limitation and the Doctrine of Laches*, 1992 BYU L. Rev. 917, 952–54 (1992).

Thus, if Grynberg cannot survive application of the *Interbank* rule, his claims would surely be doomed under Colorado Law.

The first step under *Interbank* is to determine whether the claim would be untimely under the statute of limitations for analogous claims—here, the three-year period under Colo. Rev. Stat. § 13-80-101(1)(f). We have already made that determination. As we concluded in our discussion on the breach-of-fiduciary-duty claims, that limitations period ran before Grynberg filed suit. Under *Interbank*, our next step would ordinarily be to consider whether Grynberg has proved that extraordinary circumstances justify the tardy filing of his lawsuits. But Grynberg has failed to allege extraordinary circumstances. We therefore rule that his unjust-enrichment claims are barred as untimely.

We reject Grynberg's argument that we must apply the six-year statute-of-limitations period set forth in Colo. Rev. Stat. § 13-80-103.5(1)(a). The argument was raised for the first time in postjudgment Rule 59(e) motions, and we have held that such motions cannot be used to "advance arguments that could have been raised in prior briefing." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

We also reject Grynberg's argument that the district court in the Shell Case did not apply the proper accrual provision, and his argument in both cases that his cause of action for unjust enrichment may not yet have accrued; both these arguments were raised for the first time on appeal. *See Carpenter*, 456 F.3d at

1198 n.2 (we will generally not consider arguments raised for the first time on appeal). Also, we need not address Grynberg's contentions that both district judges did not view the evidence in the light most favorable to it, that the district court made an impermissible credibility determination in the Total Case, and that both district judges incorrectly analyzed the elements of laches. Our review has been de novo and does not repeat the district judges' alleged errors.

## V. CONCLUSION

We AFFIRM both grants of summary judgment. We DENY Appellants' Motions for Certification of Questions of Law Pursuant to 10th Cir. R. 27.1.