CABLEVISION OF BRECKENRIDGE, INC., a Colorado corporation, Petitioner,

v.

TANNHAUSER CONDOMINIUM ASSOCIATION, a Colorado corporation; Tannhauser II Management Association, a Colorado corporation; Jerry O. White; Dorothy M. White; Alfred S. Leger; John R. Rademacher; Gloria Rademacher; Donald V. Bean; John Heyvaert; Ruth Heyvaert; Computercraft Services, Inc., a Colorado corporation; Bruce S. Waldo; Gwendolyn W. Waldo; Klaus P. Hendrix; Bancroft M. Tapp; Nancy Tapp; James E. Shira; Paula J. Shira; Eldon E. Beresford; Jonetta M. Beresford; Duane H. Basse; Donna L. Basse; Larry L. Oderkirk; Geraldine M. Odekirk; Richard Baisel; Marilyn S. Baisel; Joseph E. O'Neill; Linda O'Neill; Harold L. Davison; James L. Horn; Michael M. Conlin; Carol Ann J. Conlin; Clem Conlin; Patricia J. Conlin; Roger Neil Chisholm; Chester Leon Holmes; Lorraine W. Holmes; David E. Floyd; Mary Sue Floyd; William Kilzer; Diane Kilzer; Robert King; Karen King; Joel Larmore; Sharon Larmore; James D. Donahue; Rosalie C. Donahue; Melva Jeanne Leger; Thomas M. Goettsch; Viola B. Goettsch; David E. Floyd, d/b/a B & F Properties; Randolph F. Jones; Loraine E. Jones; Rondel L. Lipps; Charles Q. Harrold; Jenifred E. Harrold; Larry H. Crist; Debra L. Crist; Henry F. Nordsiek, Jr.; James D. Njos; Edward F. Collins II; Beda A. Collins; James C. Magestro; Jeannette M. Magestro; Ronald L. Lantz; Marjorie A. Lantz; Mario S. Sepulveda; Genene Kluck de Sepulveda; Elwin E. Mauer; Shirley M. Mauer, Respondents.

No. 80SC354.

Supreme Court of Colorado,
En Banc.

Aug. 23, 1982.

Callan, Lass & Klein, David R. Lass, Breckenridge, for petitioner.

Law Offices of William A. McGrath, William A. McGrath, Breckenridge, for respondents.

LOHR, Justice.

We granted certiorari to review the decision of the Colorado Court of Appeals in *Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Association*, (Colo. App.No. 79CA0924, announced September 18, 1980) (not selected for official publication), which reversed the judgment of the Summit County District Court awarding the plaintiff, Cablevision of Breckenridge, Inc. (Cablevision), damages for the wrongful conversion of its subscription cable service. We reverse the decision of the court of appeals and remand for reinstatement of the district court judgment.

## I.

This case was tried to the district court under a stipulated set of facts which included those that follow. Cablevision is a corporation engaged in providing cable television and FM radio to its subscribers in areas where the television signals are weak or nonexistent. This is a frequently encountered problem in the vicinity of Brecken-

ridge, Colorado, because the topography of the community and its distance from the originating broadcast stations generally result in an inability to receive a useful broadcast signal when using only the traditional antennas normally employed by individual households.

In order to provide its service, Cablevision constructed several antennas on a mountain peak near Breckenridge, by which it receives six television stations as well as FM radio. At the point of reception, the television signals are strong enough to reproduce a black and white picture, but are too weak to allow color reproduction. Consequently, the signals are fed into a "preamp," which magnifies their strength. The signals are then transmitted to a "headend" building, located near the receiving antennas, where they are passed through a channel processor and mixer for the purpose of improving the clarity of the picture produced by the transmission. From this building, the signals are sent by coaxial cable to the "hub" facility in Breckenridge, and thence through distribution lines to the individual subscribers. Additional amplification of the signals is necessary as they are transmitted through the system, so amplifiers are installed along the distribution lines. Cablevision's capital investment in the transmission system is approximately $450,-000.

The stipulated facts further establish that in October 1972 Cablevision entered into an oral agreement for the provision of subscription cable services with Judy Keller, who was acting on behalf of the owners of the condominium units comprising the Tannhauser I development in Breckenridge. The Tannhauser I building consisted of 33 condominium units, and each was to receive the Cablevision service. Pursuant to this agreement Cablevision installed the equipment necessary to provide its service to each of the units. This was accomplished by running a connecting line from the distribution system to an amplifier located inside Tannhauser I. The signals were then transmitted from this amplifier to individual wall plates serving each of the units. From January 1, 1972, through March 1974,

Tannhauser I paid for the service to these 33 units at a specified rate per unit.

Effective May 1974, Cablevision ceased billing for service to 33 units and began billing for service to only three units. This was done at the request of Jerry White, whose status is not described in the stipulation but who apparently acted as a representative for the Tannhauser I owners. The stipulation reflects disagreement over the exact events leading to this change in service, but it is undisputed that the Cablevision amplifier inside Tannhauser I was removed; that White then substituted his own amplifier and connected it to the Cablevision line; and that, following May 1, television and FM radio service was still provided to all 33 units of Tannhauser I despite the payment to Cablevision for service to only three of those units. This state of affairs continued from May 1, 1974, to approximately December 1, 1976.

In the fall of 1974 a second building, known as Tannhauser II and comprised of 25 condominium units, was constructed near Tannhauser I. Cablevision was never requested to supply service to Tannhauser II. However, the new building was wired internally for cable television and FM radio, and in November 1974 White supervised and assisted in the installation of a cable between Tannhauser I and Tannhauser II enabling extension of the Cablevision service to each of the 25 units in Tannhauser II. Tannhauser II began receiving the Cablevision transmission approximately November 30, 1974. Cablevision subsequently discovered the unauthorized use of its transmission by Tannhauser I and II and terminated all service to the condominiums about December 1, 1976.

Thereafter, Cablevision brought the present action, naming the condominium associations for Tannhausers I and II and the owners of the individual condominium units as defendants. Cablevision's amended complaint contained eight claims for relief, including breach of contract, concealment, conversion, various claims of unjust enrichment, and a request for injunctive relief.

However, as part of the pre-trial stipulation of facts summarized above, the parties submitted for judicial resolution the following single stipulated issue:

> Have the Defendants, or any of them, breached any contract with Plaintiff, written or oral, in fact or implied, for which Plaintiff is entitled for damages, actual or punitive?

After a hearing, the trial court entered an oral ruling incorporating the parties' stipulated facts, and holding that the defendants were liable for conversion of Cablevision's service. The parties had originally provided in their stipulation that, in the event of recovery, the damages would be $12,195, plus appropriate interest. However, the defendants advised the court subsequent to entry of the stipulation that they objected to this figure, so a further hearing was held on the question of damages. The court then entered its written judgment. The court again adopted the stipulation of the parties as its findings of fact and concluded:

> [T]he plaintiff's property and services in the furnishing of cable television is a legally protected interest for which it is entitled to charge an appropriate and lawful rate to its subscribers. The defendants, through the actions stated in the Stipulation, have converted those protected interests without fully paying for them.

Based upon the damages hearing, the court entered judgment for actual damages of $11,597.50 plus statutory interest and court costs, and denied the prayer for punitive damages. The defendants then appealed.

The court of appeals reversed. It held that the trial court erred in ruling that the defendants were liable on the basis that they converted Cablevision's property interests because, pursuant to the parties' stipulation, "the only issue before the trial court was whether any defendant breached any contract with [Cablevision]." It further held that, because the stipulation did not establish the essential elements of a contract, Cablevision had not proved its breach of contract claim. Therefore, it directed the trial court to enter judgment for the defendants.

We accepted certiorari to review the court of appeals' decision. Cablevision contends that the propriety of the trial court's departure from the stipulated issue was not properly before the court of appeals because it was not raised in the defendants' motion for a new trial. It further argues that, in any case, the trial court did not err in considering the liability of the defendants under a theory of conversion and that the court was correct on the merits of this issue. However, we do not address these arguments because we conclude that the judgment of the trial court is supported by an alternative basis of liability raised by the stipulated issue submitted by the parties.

II.

As stipulated by the parties, the issue for decision was whether "the Defendants, or any of them, breached any contract with Plaintiff, written or oral, in fact or *implied*." (Emphasis added.) We read the mention of "implied" contracts as a reference to the doctrine of quasi-contract or unjust enrichment, under which courts imply a contract as a matter of law where necessary to avoid unjust enrichment. This interpretation is based in part upon the apparent intent of parties in distinguishing "implied contracts" and contracts "in fact," and draws further support from the inclusion of unjust enrichment claims in the complaint.

In addressing only the issue of whether the stipulated evidence established a contract in fact, the court of appeals did not consider this alternative basis of liability. We conclude that the facts of this case present an appropriate basis for application of the doctrine of unjust enrichment, and reverse the decision of the court of appeals for that reason.

To recover under a theory of quasi-contract or unjust enrichment, a plaintiff must show (1) that a benefit was conferred on the defendant by the plaintiff, (2) that the benefit was appreciated by the defend-

ant, and (3) that the benefit was accepted by the defendant under such circumstances that it would be inequitable for it to be retained without payment of its value. *Dass v. Epplen*, 162 Colo. 60, 424 P.2d 779 (1967); *Mountain Medical, Inc. v. City of Colorado Springs*, 43 Colo.App. 391, 608 P.2d 821 (1979); *Jordan v. Lone Pines, Ltd.*, 41 Colo.App. 152, 580 P.2d 1273 (1978); 66 *Am.Jur.2d Restitution and Implied Contracts* § 4 at 947 (1973). Application of the doctrine does not depend upon the existence of a contract, express or implied in fact, but on the need to avoid unjust enrichment of the defendant notwithstanding the absence of an actual agreement to pay for the benefit conferred. *E.g., Valley Realty & Investment Co. v. McMillan*, 160 Colo. 109, 414 P.2d 486 (1966); *Wistrand v. Leach Realty Co.*, 147 Colo. 573, 364 P.2d 396 (1961); *see generally* 1 G. Palmer, *The Law of Restitution* § 1.2 (1978). 66 *Am.Jur.2d Restitution and Implied Contracts, supra,* § 2. The scope of this remedy is broad, cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another. 1 G. Palmer, *The Law of Restitution* § 1.1 (1978); 66 *Am.Jur.2d Restitution and Implied Contracts, supra,* § 11.

■ In the present case, we conclude that a benefit was conferred upon the defendants by Cablevision and that the defendants appreciated this benefit. The defendants' initial payment for this service in connection with the 33 Tannhauser I condominium units and their continued payment for service to three of those units amply demonstrate both the beneficial service provided by Cablevision and the appreciation of that service by the defendants. Instructive in this regard is the broad definition of benefit contained in the *Restatement of Restitution* § 1, comment b (1937):

A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the

other, or in any way adds to the other's security or advantage. He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss. The word "benefit," therefore, denotes any form of advantage.

We also conclude that the defendants have retained this service under such circumstances that it would be inequitable to allow its use without payment for its value. The stipulated facts demonstrate that Cablevision never intended to provide its service to all of Tannhausers I and II in exchange for payment in connection with only three units. Indeed, upon discovery of the unauthorized use of its signals, Cablevision terminated all service to the defendants. Further, the defendants were not innocent or unwilling recipients of this benefit, but actively facilitated its provision.

The defendants contend that Cablevision was not harmed by the use made of its signal because it received compensation for the three signals delivered to the three Tannhauser I units pursuant to oral agreement; additional signals were not appropriated by the defendants; and the amplification and use of these signals within Tannhausers I and II did not impair Cablevision's ability to serve its other subscribers. However, this argument ignores the substance and effect of the defendants' conduct and the nature of the harm suffered by Cablevision. The ability of Cablevision to charge for its service is necessary to its economic viability. "Subscription stations rely upon fees paid by viewers rather than upon advertising proceeds for their support. Continued existence of the subscription television industry therefore depends upon the stations' ability to charge fees by limiting reception of their message to subscribers." Note, *Decoding Section 605 of The Federal Communications Act: A Cause of Action for Unauthorized Reception of Subscription Television*, 50 *U.Cin.L.Rev.* 362 (1981). By retransmission of the signals purchased in connection with three Tannhauser I units to non-subscribers, the defendants have undercut Cablevision's ability to sell its signal to

these other potential customers. These business realities highlight the inequity of permitting the defendants to retain the benefits of Cablevision's service without payment of its value.

For similar reasons we reject the defendants' contention that their conduct is analogous to a subscriber moving his television set from room to room within his house or to a subscriber recording Cablevision's transmission by means of a video tape recorder. Such devices or activities merely increase the utility of the signals to the paying subscriber. In contrast, the defendants' conduct in the present case impairs the ability of Cablevision to. sell its service to other potential subscribers.

█ The defendants also point to the fact that Cablevision acquires its signals free of charge and contends that, because Cablevision merely intercepts broadcast signals originated by others, it has no legally protected interest in those images and transmissions. Again, we find this argument unpersuasive. Although Cablevision does not acquire an exclusive right in the broadcast signals it receives, in the sense that it could prohibit others from independently receiving those signals by use of a home antenna or a competing, properly licensed subscription service, *see Intermountain Electronics, Inc. v. Tintic School District*, 14 Utah 2d 86, 377 P.2d 783 (1963), Cablevision does have a legally protected interest in the reception, processing and distribution system it has installed and in the service that this system enables Cablevision to provide. It is the unauthorized use of this valuable service that is at issue, and the defendants' focus upon the absence of an exclusive proprietary interest to receive and distribute the programming delivered by that service misses the point.

█ The defendants have accepted a service from Cablevision that is customarily paid for and, in fact, was initially paid for by these defendants. The defendants were active participants in obtaining this benefit from Cablevision, and, based on the initial agreement to serve Tannhauser I, their representatives must have acted with the knowledge that Cablevision expected compensation for each Tannhauser unit receiving the Cablevision transmission. Under these facts, restitution is appropriate to avoid unjust enrichment to the defendants. *See Dass v. Epplen, supra; Valley Realty & Investment Co. v. McMillan, supra;* 66 *Am. Jur.2d Restitution and Implied Contracts, supra,* § 24.

█ The damages awarded were based upon the rate prescribed in Cablevision's franchise from Breckenridge, which correspond to the rate paid for the three Tannhauser I units during the period of unauthorized use of the Cablevision signals. This was an appropriate measure of the benefit conferred upon the defendants and the amount of restitution due. *See* 66 *Am. Jur.2d Restitution and Implied Contracts, supra,* § 166; *Restatement of Restitution, supra,* § 157.

Although we do not reach the correctness of the grounds relied upon by the trial court in support of its decision, we conclude that the judgment was proper based upon a theory of quasi-contract or unjust enrichment, and that the court of appeals therefore erred in reversing that judgment. *See, e.g., Metropolitan Industrial Bank v. Great Western Products Corp.,* 158 Colo. 198, 405 P.2d 944 (1965); *Consolidated Oil & Gas, Inc. v. Superior Oil Co.,* 157 Colo. 86, 401 P.2d 89 (1965).

We reverse the decision of the court of appeals and return the case to that court for remand to the trial court with directions to enter judgment in accordance with the views expressed in this opinion.

LEE, J., does not participate.