COLORADO COURT OF APPEALS                                    **2016COA118**

Court of Appeals No. 15CA1055
Park County District Court No. 14CV30056
Honorable Stephen A. Groome, Judge

Indian Mountain Corporation,

Plaintiff-Appellant,

v.

Indian Mountain Metropolitan District,

Defendant-Appellee.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE FREYRE
Taubman and Dailey, JJ., concur

Announced August 11, 2016

Adam Davenport, Golden, Colorado, for Plaintiff-Appellant

Hill & Robbins, P.C., Peter J. Ampe, Matthew A. Montgomery, Denver,
Colorado, for Defendant-Appellee

¶ 1     Plaintiff, Indian Mountain Corporation (IMC) appeals the trial court's judgment imposing a constructive trust on its water rights and augmentation Plan for the benefit of defendant, Indian Mountain Metropolitan District (IMMD), based on a theory of unjust enrichment. IMC also appeals the court's finding that IMMD is compliant with its service Plan.

¶ 2     This case presents the unusual circumstance of a private company (successor of the original developer) holding legal title to the water rights and augmentation Plan for the benefit of a subdivision rather than a mandatory homeowners association, as is the customary practice, and its desire to be compensated for providing water services to the subdivision. It also presents a unique situation in which a special district asserts unjust enrichment on behalf of some of the constituents it was created to serve. Because we conclude that IMC is the legal title holder to the water rights and augmentation Plan and that the elements of unjust enrichment have not been proved, we reverse that part of the court's judgment imposing a constructive trust. We affirm the court's finding that IMMD is in compliance with its service Plan.

## I.  Background

¶ 3     This case arose out of a dispute concerning the ownership of water rights and a corresponding water augmentation Plan in Park County.  In 1970, Park Development Company (later Meridian Property and hereafter developer) purchased 10,000 acres of property, including water rights, with the vision of creating an upscale residential subdivision situated within a community of outdoor amenities, including an executive golf course, a ski resort, equestrian trails, and hiking trails.  The water rights encompassed the Slater Ditch and two reservoirs (Tarryall Ranch Reservoirs 1 and 2).

¶ 4     The Indian Mountain Subdivision (subdivision) currently comprises approximately 2,450 lots zoned for residential use.  Each lot is served by a residential well.  The groundwater pumped by the wells reduces the stream flow in Tarryall Creek, which flows into the South Platte River.  The South Platte River is over-apportioned, meaning that the demand for water exceeds the available supply.

¶ 5     In 1972, after residential construction had begun, the Colorado General Assembly enacted new legislation (Senate Bill 35) in response to the recognition that land development was outpacing

available water supplies.  As relevant here, this new legislation required that water depleted by subdivision lots of less than thirty-five acres be replenished or augmented by a water-court-approved augmentation Plan.  This new legal requirement caused the sale of subdivision lots to cease until the developer could secure a court-approved augmentation Plan.

¶ 6     In January 1974, Water Court Division 1 approved the Indian Mountain Augmentation Plan (the Plan).  The Plan required that portions of developer's water rights be used solely for the benefit of the subdivision, and it guaranteed a household well permit to each lot owner upon the payment of a $5 application fee.  Importantly, the PLAN did not address the remaining water rights in the Slater Ditch or the reservoirs and did not require the transfer of the Plan Decree to a mandatory homeowners association[1] or to a metropolitan district.

¶ 7     Thereafter, development of the subdivision resumed.  Crucially, the plat filings for the subdivision and the lot deeds

---

[1] The subdivision currently has a voluntary homeowners association that requires 75% approval of its members to implement changes.

addressed water services and informed prospective buyers that "[a]ll utilities (Elec., Water, Sewer, Gas and Telephone) shall be provided at the individual lot owner's expense."

¶ 8    The costs associated with obtaining the Plan left the developer with too much debt to continue the development project. Thus, in 1976, the developer sold its interest (including debts) in the platted and unplatted lands, the water rights, and the Plan to IMC and its principal owner, James Campbell. IMC sold the remaining lots (totaling 2,450) in the subdivision to pay off the debts it had assumed.

¶ 9    IMC's lot purchase agreements included a "Developer's Property Report," which informed buyers that water would be supplied by individual wells, that the state engineer would issue a well permit upon payment of an application fee,[2] and that water use was governed by the covenants. It further stated that there was "no assurance that wells [could] be drilled and operated successfully in the subdivision," and provided that in the event no well could be drilled or operated successfully "no refund of the purchase price of

---

[2] IMC's subdivision fact sheet also guaranteed a well permit.

[the] lot [would] be made." Finally, it did not guarantee the purity of the water and contained a warning stating as follows: "THERE IS NO ASSURANCE OF A SUFFICIENT SUPPLY OF WATER FOR THE ANTICIPATED POPULATION OF THE SUBDIVISION."

¶ 10    Attached to the purchase agreement was the "Developer's Statement," which set forth specific items a purchaser acknowledged by his or her signature. As relevant here, item three stated

> I/we hereby understand that a well and septic tank *are not included in the price of the site* and when and if these facilities are installed, that the cost shall be born[e] by the purchaser(s).

¶ 11    Although the deeds and developer's materials stated that the cost of water was a lot owner's expense, IMC did not separately advise prospective buyers that they would be charged for operation of the Plan. Indeed, from 1974 to 2013, both the developer and IMC maintained and operated the Plan for the subdivision at their own expense. This entailed cleaning out and repairing the water diversion ditches leading into the reservoirs and releasing water downstream when requested by the district water engineer. No one

disputes that the lot owners have always received uninterrupted water services under the Plan.

¶ 12    In 1972, the developer spearheaded the creation of the Indian Mountain Park and Recreation District (IMPRD)[3] to assume maintenance of and to eventually purchase the common areas through a tax assessment.  Importantly, because the IMPRD did not have the legal authority to acquire water rights or to provide water services, its service plan did not include water services.  Campbell eventually deeded the common areas to the IMPRD for $17,000.

¶ 13    Through the years, Campbell encouraged the subdivision lot owners to explore ways for the homeowners to assume responsibility for the Plan.  Homeowners association minutes and newsletters reflect the subdivision's recognition that it faced being assessed a charge for the Plan and that several options were available for management of the Plan, including sale of the water rights and Plan to a third party, sale to a water district, or sale to an entity within the Indian Mountain community.

---

[3] *See infra* Part IV discussing special districts, including parks and recreation districts.

¶ 14    In 2012, members of the IMPRD suggested converting to a metropolitan district that could legally purchase and provide water services.[4] The Park County Board of County Commissioners approved the conversion and the amended service plan in January 2013. Then, the district court entered an order approving the board's actions and converting the district's name to the Indian Mountain Metropolitan District.

¶ 15    Negotiations for IMMD's acquisition of the Plan from Campbell began, but no agreement could be reached. Campbell believed the water rights possessed monetary value and wished to be compensated accordingly. IMMD, on the other hand, believed that Campbell's involvement in amending the service plan and IMC's operation of the Plan for forty years at no expense to the lot owners obligated him to convey the water rights and Plan to the district for the benefit of the lot owners at no cost.[5]

---

[4] *See infra* Part IV defining the responsibilities of a metropolitan district.

[5] E-mail exchanges between Campbell and IMMD during this time reflected IMMD's position that it was willing to continue receiving the benefit of Campbell's free water services if the parties could not reach an agreement.

¶ 16    In August 2013, the owners of Bar Star Land, Jim Ingalls and Mark Goosman, approached Campbell about his willingness to sell the reservoir[6] because they had purchased 142 acres abutting the reservoir for their cattle ranch operations.  Campbell informed Ingalls of his failed negotiations with IMMD, and both parties believed a new face would improve relations.  Campbell sold all of IMC's assets, including the remaining property, the mineral rights, the water rights, and the Plan to Bar Star for $290,000.

¶ 17    Following the sale, Ingalls entered into negotiations with IMMD to either lease or sell the water rights and Plan in accordance with the amended service Plan.  He complied with the Plan by cleaning out the diversion ditches and releasing water at the water engineer's request.  At IMMD's insistence that there be clear title to the water rights, Ingalls also incurred legal fees for the execution of a quitclaim deed (recorded in April 2014) confirming the previous conveyance of the developer's interest in the water rights to IMC.

¶ 18    Unlike Campbell, who was willing to absorb the expenses of managing the Plan with the hope of future reimbursement, Ingalls

---

[6] The original two reservoirs had been consolidated into a single reservoir by the time this case began.

expected reimbursement.  Ingalls valued his water rights at $1.6 million based upon his research of comparable water rights located in South Park and conversations with representatives from the Head Waters Authority of the South Platte (HASP) and Still Water Resources.  He presented IMMD with two purchase options and three lease options.[7]

¶ 19     When Ingalls and IMMD could not reach an agreement on the proposed options, Ingalls submitted two invoices to IMMD (one for 2012 and one for 2013) each in the amount of $143,000[8] for the operation of the Plan on behalf of the subdivision.  This charge reflected an annual per well cost of $178.75 (based on 800 existing

---

[7] Option 1 involved sale of the water rights for $550,000 and operation of the Plan for $19.95 per well per year.  Option 2 involved sale of the water rights for $390,000 in exchange for conveyance of the community center and golf course back to IMC and operation of the Plan for $19.95 per well per year.  Option 3 involved a 1-year lease for $30 per well per month, a 3-year lease for $20 per well per month or a 10-year lease for $10 per well per month.

[8] This amount included expenses plus a 10% return on investment.

wells) or per lot cost of $58.37 (2,450 lots).  IMMD refused to pay the invoices.[9]

¶ 20    IMC filed this action in district court seeking a declaratory judgment that as between IMC and IMMD, IMC is the legal owner of the water rights and Plan and that IMMD have no right, title, or interest in them.  IMC also alleged that IMMD had been unjustly enriched by not paying IMC for water services in 2012 and 2013 that IMMD had been specifically created to provide.  Thereafter, IMMD filed an answer and a counterclaim seeking a declaratory judgment that the Indian Mountain lot owners, not IMMD or IMC, own the Plan and associated water rights as beneficiaries of a constructive trust.

¶ 21    As relevant here, the district court issued an order in favor of IMMD, finding that IMC held the water rights and the Plan in a constructive trust for the benefit of the lot owners, that costs related to the Plan were part of the lot sales price, and that IMC would be unjustly enriched if it was permitted to charge lot owners

---

[9] Thereafter, IMC sent invoices to the lot owners seeking reimbursement for operating the Plan, and numerous lot owners paid those invoices at a cost of $25 per well per month.

for operating the Plan.  It also concluded that IMMD was in compliance with the amended service plan.  IMC filed a post-judgment motion requesting a hearing on the amount of reasonable fees it could charge IMMD for ongoing operation of the Plan which the court denied.

## II.    Procedural Posture

¶ 22     Initially, we note that this case comes before us in an unusual procedural posture.  Both parties sought competing declaratory judgments under C.R.C.P. 57(a).  IMC sought declaratory relief as to ownership of the water rights and Plan.  IMMD sought declaratory relief in its counterclaim under the theory that IMC held the water rights in a constructive trust for the benefit of the lot owners and would be unjustly enriched by continuing to hold, control, and charge for operation of the Plan.  While a declaratory judgment is the proper vehicle to determine the relative rights between the parties, it is usually based on the interpretation of a written instrument or statute.  *Am. Family Mut. Ins. Co. v. Bowser*, 779 P.2d 1376, 1379 (Colo. App. 1989); *see also* C.R.C.P. 57(b).

¶ 23     Here, rather than basing its theory of ownership on a written instrument, IMMD pleaded a theory of ownership based on

11

"constructive trust." However, such trusts are remedial in nature and are not appropriately pleaded as a separate cause of action. *See Bryant v. Cmty. Choice Credit Union,* 160 P.3d 266, 276 (Colo. App. 2007). Nonetheless, a district court may impose a constructive trust as a remedy for unjust enrichment, and the district court did so here, construing IMMD's claim as one alleging that IMC had been unjustly enriched. Accordingly, we review the court's order under the law of unjust enrichment — "an equitable remedy [that] does not depend on any contract, oral or written"— not as a declaratory judgment based on a written instrument or statute. *Lewis v. Lewis,* 189 P.3d 1134, 1141 (Colo. 2008).

¶ 24    Further, we note that the lot owners, who received and continue to receive the benefit of the Plan, are not parties to this action. The lot owners were not joined in the district court, and a joinder issue was not preserved for appeal. Accordingly, our review is limited to the relative rights of IMC and IMMD.

### III.    Unjust Enrichment

¶ 25    IMC contends the district court erred in finding that it held the water rights and Plan in a constructive trust and that it would be

unjustly enriched by seeking reimbursement for the costs of maintaining and operating the Plan. We agree.

### A. Standard of Review and Law

¶ 26 A district court must engage in fact-based inquiries and make "extensive factual findings" when determining an unjust enrichment claim. *Id.* at 1140-41; *Martinez v. Colo. Dep't of Human Servs.*, 97 P.3d 152, 159 (Colo. App. 2003). Because the power to devise remedies lies within a district court's discretion, we review a district court's findings of fact and its determination that a party was unjustly enriched for an abuse of discretion. *Lewis*, 189 P.3d at 1140-41. Nonetheless, the district court's discretion in equity determinations is not unlimited. *Id.* at 1141. The court must apply the appropriate legal test in order to find unjust enrichment. *Redd Iron, Inc. v. Int'l Sales & Servs. Corp.*, 200 P.3d 1133, 1136 (Colo. App. 2008). Thus, we review de novo whether the district court applied the proper legal test for determining the existence of unjust enrichment. *Id.*; *see also Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo. App. 2009).

¶ 27 Unjust enrichment is a judicially created remedy designed "to avoid benefit to one to the unfair detriment of another." *Lawry v.*

*Palm,* 192 P.3d 550, 564 (Colo. 2008). A person is unjustly enriched when he or she benefits as a result of an unfair detriment to another. *Salzman v. Bachrach,* 996 P.2d 1263, 1265 (Colo. 2000). The proper remedy when unjust enrichment occurs is to restore the harmed party "to the position he [or she] formerly occupied either by the return of something which he [or she] formerly had or by the receipt of its equivalent in money." Restatement (First) of Restitution § 1 cmt. a (Am. Law Inst. 1937); *see also Redd Iron,* 200 P.3d at 1136 ("[T]he party who has received the benefit is ordinarily required to make restitution in the amount of the enrichment received.").

¶ 28 To succeed on a claim of unjust enrichment, the moving party must establish that (1) the nonmoving party received a benefit (2) at the moving party's expense (3) under circumstances that would make it unjust for the nonmoving party to retain the benefit without commensurate compensation to the moving party. *Lewis,* 189 P.3d at 1141.

¶ 29 The district court issued an order concluding that

14

- Ingalls, by purchasing IMC, stepped into Campbell's shoes and was bound by the significant history of the subdivision's development;

- none of the developer's promotional materials or the Housing and Urban Development (HUD) disclosure documents mentioned an ongoing fee for operation of the Plan, and IMC was "estopped from asserting such a right forty (40) years later";

- IMC received its return on investment (profit) and its reimbursement of expenses for operating the Plan from the lot sales, and permitting IMC to charge ongoing fees for water use would constitute "double-dipping," would be unconscionable, and would unjustly enrich IMC;

- the Plan was established for the benefit of the lot owners so that they could drill wells for potable water and although lot owners could purchase water from another source at considerable expense, this was not what they bargained for when purchasing their property;

- while IMC was the legal owner of the water rights and Plan, it held these rights in a constructive trust for the benefit of the lot owners;

- as long as IMC elected to retain ownership, it was entitled to be reimbursed for its actual and reasonable expenses for maintenance, repair, and operation of the Plan, although IMC could delegate this task or "turn over ownership" to IMMD; and

- IMMD's service plan permitted but did not require that it take over management of the Plan; therefore, its provision of other water services outside of the Plan complied with its service plan and the statute.

## B. Receipt of a Benefit

¶ 30    A benefit may be the performance of services beneficial to or at the request of another, or it may be anything that adds to another's security or advantage. *Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Ass'n,* 649 P.2d 1093, 1097 (Colo. 1982); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. d (Am. Law Inst. 2011) ("Restitution is concerned with the

receipt of benefits that yield a measurable increase in the recipient's wealth."). Thus, the word benefit denotes any form of advantage. *Cablevision of Breckenridge, Inc.* v, 649 P.2d at 1097.

¶ 31 Usually, decisions of a district court regarding factual disputes are accorded great deference. *Quintana v. City of Westminster*, 56 P.3d 1193, 1196 (Colo. App. 2002). However, this court may determine that a finding of fact is clearly erroneous if there is (1) no support for it in the record, *see Cont'l W. Ins. Co. v. Jim's Hardwood Floor Co., Inc.*, 12 P.3d 824, 828 (Colo. App. 2000); or (2) evidence to support it, but we are nonetheless left, after a review of the entire evidence, with the firm and definite conviction that a mistake has been made, *In re Estate of Schlagel*, 89 P.3d 419, 422 (Colo. App. 2003); *Quintana*, 56 P.3d at 1196.

¶ 32 The parties do not dispute that IMC stepped into the shoes of Campbell and the developer or that the Plan was created for the benefit of the subdivision. Therefore, we conclude the court correctly determined that when Ingalls purchased the assets of IMC, he also assumed the legal rights and obligations associated with the Plan decree.

¶ 33     We note that the district court did not articulate the factual basis for its finding that the lot prices included the Plan as is required in an unjust enrichment analysis. *See Lewis*, 189 P.3d at 1140-41. At oral argument, IMMD's counsel suggested that basis was Copeland's testimony; however, our review of the record shows that Haas and Mattson offered relevant testimony as well. And, although they all opined that the lot prices included the costs of operating the Plan, each did so under a slightly different theory that is directly refuted by documentary evidence in the record. Therefore, we are left, after reviewing the entire record, with a firm and definite conviction that a mistake has been made and that the evidence does not support the court's finding of unjust enrichment. *See Mendiola v. United States*, 994 F.2d 409, 410 (7th Cir. 1993) ("Findings are clearly erroneous if the district court's interpretation of the facts is . . . contradicted by documentary or other extrinsic evidence.").

### 1.     Mattson's Testimony

¶ 34     Mattson opined that because the legal descriptions of the subdivision (which included the water rights) contained in the Plan and in the 1975 order creating the IMPRD were identical, the order

creating the IMPRD transferred both the facilities and the water rights to it. To the extent the district court reached the same conclusion after conducting its own review of the documents, we note that we are not bound by a district court's (or a witness') construction of a document and are in the same position as a district court to interpret it. *See Darnall v. City of Englewood*, 740 P.2d 536, 537 (Colo. App. 1987) ("Appellate courts are not bound by a trial court's construction of charters and ordinances."). Upon our review of the Plan and the 1975 order, we conclude that the legal descriptions served other purposes and did not evidence the intent to transfer water rights to the district.

¶ 35    As discussed in Part IV, a parks and recreation district does not have the statutory authority to acquire or manage water rights. However, it has the authority to tax residents in its service area and a duty to provide the services set forth in its service plan to those residents. Thus, we conclude that the legal description in the 1975 order defined the boundaries of the district's taxing authority and its service area, but did not evidence an intent to convey the water rights or the Plan to the district.

19

¶ 36 Similarly, the legal description in the Plan decree describes its property boundaries and, as noted above, contains no conveyance language or any conveyance requirement. We cannot read conveyance language that does not exist into the 1975 order or the PLAN. *See USI Props. E., Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997) (it is axiomatic that when construing an unambiguous document courts should not rewrite its provisions); *cf. Dubois v. Abrahamson*, 214 P.3d 586, 588 (Colo. App. 2009) ("[W]e may not read additional terms into, or modify, the plain language of a statute."). Accordingly, to the extent the district court relied on Mattson's opinion to find the lot prices included the cost of the Plan, we conclude that the court clearly erred.

## 2. Haas' Testimony

¶ 37 Haas advanced three theories under which he believed the lot prices included the Plan: (1) the community amenities added market appeal which increased IMC's lot sales and profits; (2) the well permit and Plan were a "package," and the developer's guarantee of a well permit necessarily included the Plan as part of the lot price; and (3) the 1975 parks and recreation district order evidenced conveyance of the water rights to the district. For the

reasons stated above, we reject the third theory and address the alternative theories below.

¶ 38     While no one disputes that IMC sold lots and received a monetary benefit from the sales, we conclude the record shows that the wells and any associated water services (Plan) were intended to be a separate expense from the lots themselves and were not part of a "package." Indeed, the post-Plan lot purchase agreements referenced the property report which promised a well permit and provided cost estimates for drilling. It did not, however, guarantee the existence of water or that a well could be successfully drilled. Moreover, it stated that the failure to successfully drill a well *would not be a basis for a refund of the lot purchase price.* Nowhere did the purchase agreement suggest that the price of the lot included water rights or water services.

¶ 39     Additionally, the recorded land plats and deeds specifically informed lot owners that they would be responsible for the costs of utilities including water, and showed that water and water services were contemplated as a separate expense from the cost of the lots themselves. This is further corroborated by the developer's statement in which buyers acknowledged their understanding that

the cost of the well and septic tank were not included in the price of the site and that they would be separately responsible for those costs.

¶ 40    While we agree with the court's finding that the HUD disclosure document did not inform prospective buyers that they would be responsible for the costs of operating the Plan, it also did not say that water services would be provided at no expense. Moreover, it contained other language informing prospective buyers that future changes to the water plan, including the creation of a municipality or a metropolitan district, could involve additional, undeterminable expenses to the lot owners. This language is consistent with the language of the deeds, the property report, the developer's statement, and the covenants,[10] and demonstrates that water services were intended to be a separate expense from the lot. Because we conclude the documentary evidence shows that the lot prices did not include the cost of the Plan, the increased number of lots sold due to the amenities (theory one) is irrelevant to the unjust enrichment analysis.

_____

[10] The covenants do not separately address the PLAN or its operating costs.

¶ 41    Accordingly, after reviewing the entire record, we are left with the firm and definite conviction that to the extent the district court relied on Haas' opinion to find the lot sales included the costs of the Plan, it clearly erred because the documentary evidence contradicts this conclusion.  *See Mendiola*, 994 F.2d at 410.

### 3.    Copeland's Testimony

¶ 42    Copeland opined that the ability to drill a well increased the value of a lot and that IMC was able to charge more for a lot (profit) because it guaranteed a well permit.  Similar to Haas, he tied the value of the lots to the guaranteed well permit, which he opined included the Plan as a package.  For the reasons stated above, we reject that opinion.

¶ 43    Finally, substantial evidence showed that other Park County residential well owners had always paid for water augmentation either through mandatory homeowners association fees or through contracts with water service providers.  In contrast, the undisputed evidence showed that the developer incurred substantial debt in obtaining the Plan for the subdivision and that IMC assumed those debts and absorbed the Plan's operating expenses for forty years without reimbursement.  Therefore, on this record, we conclude

that IMMD failed to prove the first element of unjust enrichment and that the district court clearly erred in finding that the lot prices included the costs of the Plan.

### C. At the Moving Party's Expense

¶ 44     Satisfaction of the second element of unjust enrichment requires that the nonmoving party's receipt of a benefit be *at the expense of the moving party* or "as a result of an unfair detriment to another." *Lewis*, 189 P.3d at 1141.

¶ 45     The district court's order did not address how IMC benefited *at IMMD's expense*. Indeed, the order stated the contrary: "IMMD has not paid any money to IMC." Critically, no evidence shows that IMMD stood in the shoes of the lot owners (the contracting parties). IMMD never pleaded or presented evidence that it stood in "privity" with the subdivision lot owners or that its interests in carrying out its service plan substantially aligned with the lot owners' interests. *See Mitchell v. Tex. Gulf Sulphur Co.*, 446 F.2d 90, 105 (10th Cir. 1971) (privity or direct personal dealings required for recovery of restitution in unjust enrichment); *see also Pub. Serv. Co. of Colo. v. Osmose Wood Preserving, Inc.*, 813 P.2d 785, 788 (Colo. 1991)

24

(finding indemnity agreement does not always create privity); *see also Landstrom v. Shaver*, 561 N.W.2d 1, 13 (S.D. 1997) (holding that a minority shareholder in a close corporation may have different interests than a majority shareholder).

¶ 46     At oral argument, IMMD argued that privity existed based on its taxing authority over the lot owners.  However, this argument was not made in the district court or raised in the briefs, and we may not consider arguments raised for the first time at oral argument.  *See Bumbal v. Smith*, 165 P.3d 844, 847-48 (Colo. App. 2007).  Because IMMD stipulated that it had never paid IMC for water services and the court found likewise, we conclude no record evidence shows that IMC benefited at IMMD's expense and thus the second element of unjust enrichment is not satisfied.

### D.     Circumstances Making IMC's Retention of Water Rights Unjust

¶ 47     The third element of the unjust enrichment analysis, whether it would be unjust for IMC to retain the water rights and Plan, "creates difficult questions for trial courts."  *Redd Iron*, 200 P.3d at 1136 (quoting *Lewis*, 189 P.3d at 1142).  That is because "[t]he notion of what is or is not 'unjust' is an inherently malleable and

unpredictable standard." *DCB Constr. Co., Inc. v. Cent. City Dev. Co.*, 965 P.2d 115, 120 (Colo. 1998).

¶ 48 We agree with the district court's conclusion that IMC holds legal title to the Plan; however, for the reasons stated in Part III.B, we disagree that there was sufficient evidence to establish that IMC benefited from the sale of the lots or would be unjustly enriched by charging ongoing fees to operate the Plan. No one disputes that whoever holds title to the Plan is obligated to operate it for the benefit of the subdivision. The record shows that the lot owners have always received uninterrupted augmentation water services since the water court issued the Plan decree.

¶ 49 Additionally, the record demonstrates that the Division of Water Resources and the water commissioner would hold IMC accountable for any failure to comply with the Plan. Further, the water court may impose remedial sanctions for any failure to comply with its augmentation decree. *See* C.R.C.P. 107(a)(5) (stating that a court may impose sanctions to force compliance with a lawful order). Thus, contrary to the district court's finding, we conclude that the lot owners are not "over a barrel" and may enforce their rights under the Plan. And, as the district court found and as

26

the record shows, the lot owners are not required to obtain water under the Plan, but may purchase water from another water service provider if they so choose. Accordingly, we conclude that the elements of IMC's unjust enrichment were not proved and that the district court erred in concluding otherwise.

¶ 50　Having concluded that IMC was not unjustly enriched at IMMD's expense, we also conclude that no basis exists to impose the equitable remedy of a constructive trust. *See Lawry*, 192 P.3d at 562 (constructive trust is an equitable remedy that can be imposed as a form of restitution to remedy unjust enrichment). Therefore, we reverse the court's judgment imposing a constructive trust on IMC's water rights, including the Plan. We conclude that IMC holds legal title to the water rights and Plan and that it is entitled to assess charges for operating the Plan from 2012 onward.[11]

¶ 51　Finally, while both parties raise arguments concerning the appropriate amount IMC can charge lot owners for operating the

---

[11] Both in the trial court and at oral argument IMC agreed that, absent a constructive trust, it had no basis to charge lot owners for previous Plan services.

27

Plan, we decline to address this issue because the lot owners were not joined as parties. We note, however, that absent regulations governing water fees, IMC, as a private entity, may charge whatever price for its services the market will bear, particularly given lot owners' ability to purchase water from several different sources.

## IV. Service Plan Compliance

¶ 52    IMC contends that the district court erred in denying its request to enjoin IMMD from operating as a metropolitan district due to IMMD's noncompliance with its service plan. IMC argues that the service plan required IMMD to provide two services, that the service plan was created to allow IMMD to purchase or operate the Plan, and that IMMD's failure to acquire or operate the Plan is a material modification to its service plan and is contrary to statute. We disagree and affirm the court's order.

### A. Relevant Facts

¶ 53    As set forth above, the IMPRD was converted to a metropolitan district so that the district could legally acquire and maintain water rights. The rationale IMPRD presented to the county

28

commissioners for modifying the service plan included four reasons

relevant to this appeal:

> (1) The 1972 service plan did not include the
> management of 450 acres of parklands, forests, open
> space, waterways, ponds, and wetlands.
>
> (2) The 1972 service plan did not adequately reflect
> water storage and transfer assets associated with the
> district or show that the district managed two ponds,
> two dams, wetlands, and a section of Tarryall Creek.
>
> (3) The 1972 service plan did not include management of
> the Plan, and IMMD was exploring ways it could own or
> manage the Plan and thereby ensure that lot owners
> would always have augmentation services.
>
> (4) The most significant concern of the homeowners
> association's approximately 700 members was control of
> the Plan and its associated resources. Because the
> association could not purchase or manage the Plan, it
> supported changing the service plan to enable IMMD to
> do so.

¶ 54    The language of the amended service plan required IMMD to provide two services — parks and recreation services and water services. Parks and recreation services included maintenance of the wetlands, ponds, waterways, and IMMD's facilities. Those facilities included a comfort station, restrooms, potable water, a small overnight cabin, a community center, and a library.

¶ 55    Water services included the maintenance of two earthen dams, wetland corridors, a section along the Tarryall Creek, and the seasonal ponds. The water services provision also gave IMMD the authority to acquire ownership of, finance, and maintain the PLAN, including the water rights, storage reservoirs, and all other appurtenant facilities.

¶ 56    Additionally, the service plan stated that IMMD "shall have the power and authority to contract with other private and governmental entities to provide any or all of the services associated with" the Plan.

¶ 57    The undisputed evidence showed that IMMD provided all services stated in the amended service plan except for acquisition or operation of the Plan. Because IMC does not dispute that IMMD properly provided parks and recreation services and water services

30

related to the wetlands, dams, ponds, and a section of Tarryall Creek, we do not address that part of the amended service plan. The district court found that while the primary purpose for amending the service plan was to allow IMMD to take over the Plan, the language of the service plan was permissive and did not require IMMD to manage the Plan. We agree.

## B. Discussion

¶ 58    We review a district court's interpretation of a service plan de novo. *Plains Metro. Dist. v. Ken-Caryl Ranch Metro. Dist.*, 250 P.3d 697, 699 (Colo. App. 2010).

¶ 59    The General Assembly enacted the Special District Act with the intent that special districts "promote the health, safety, prosperity, security, and general welfare" of their inhabitants and of the State of Colorado. § 32-1-102(1), C.R.S. 2015; *see also Todd Creek Vill. Metro. Dist. v. Valley Bank & Trust Co.*, 2013 COA 154, ¶ 37. Special districts are political subdivisions of the state that possess proprietary powers. *Todd Creek*, ¶ 38. But, they possess only those powers expressly conferred on them. *SDI, Inc. v. Pivotal Parker Commercial, LLC*, 2012 COA 168, ¶ 16, *rev'd on other grounds*, 2014 CO 80.

¶ 60    Persons intending to form a special district must submit a service plan to the board of county commissioners.  *See* § 32-1-202, C.R.S. 2015.  When the special district is a metropolitan district, the service plan must state a minimum of two services it intends to provide.  § 32-1-1004(2), C.R.S. 2015.  A list of the services a plan shall include is set forth in section 32-1-1004(2) and, as relevant here, includes "parks or recreational facilities or programs as specified in section 32-1-103(14)," § 32-1-1004(2)(c), and "water as specified in section 32-1-103(25)," § 32-1-1004(2)(j).

¶ 61    Once established, a special district must conform to its service plan "so far as practicable."  § 32-1-207(1), C.R.S. 2015.  Further, any material modifications to the service plan must be approved by the board of county commissioners.  § 32-1-207(2)(a).  The Special District Act defines "material modifications" as

> changes of a basic or essential nature, including but not limited to the following: Any addition to the types of services provided by the special district; a decrease in the level of services; a decrease in the financial ability of the district to discharge the existing or proposed indebtedness; or a decrease in the existing or projected need for organized service in the area.

*Id.*

32

¶ 62    The determination of whether IMMD's failure to operate the

Plan constitutes a "material modification" involves a question of law

that we review de novo.  We look to the language of the service plan

and give effect to its plain and ordinary meaning.  *People in Interest*

*of J.G.*, 2016 CO 39, ¶ 13.

¶ 63    The service plan language at issue here is "shall have the

power and authority to finance, design, construct, acquire, install,

maintain and provide services associated with the ownership and

administration of the Indian Mountain water augmentation Plan."

The term "shall" in a service Plan is construed to impose an

obligation.  *Plains Metro. Dist.*, 250 P.3d at 700.  In contrast, the

use of the term "may" is "indicative of a grant of discretion."  *Id.*

¶ 64    We conclude that the word "shall" is part of the phrase "shall

have the power and authority" and cannot be construed to relate to

the infinitive verb forms of finance, design, construct, acquire,

install, maintain, and provide.  Thus, "shall" does not obligate

IMMD to acquire or operate the Plan, but, instead, grants

unconditional authority to IMMD to do so.  IMMD's failure to

acquire or operate the Plan does not constitute a material

modification of its service plan because it does not decrease or

otherwise alter the services it provides. Accordingly, we conclude that the service plan did not require IMMD to acquire or operate the Plan, and that IMMD properly provided two services in compliance with its service plan. We affirm the court's order finding for IMMD on this issue.

## V. IMC's Remaining Contentions

¶ 65 Having reversed the district court's findings of unjust enrichment and constructive trust, we need not reach IMC's remaining contentions. Therefore, we do not address whether the district court erred in admitting witness testimony absent personal knowledge or whether it erred in its findings under the Interstate Land Sales Act.

## VI. Conclusion

¶ 66 We affirm the district court's judgment declaring that IMC holds legal title to the water rights and Plan and finding IMMD in compliance with its service plan. We reverse that part of the court's judgment finding that IMC was unjustly enriched and imposing a constructive trust, and we instruct the district court to enter a judgment in favor of IMC consistent with this opinion.

JUDGE TAUBMAN and JUDGE DAILEY concur.